# TOWN OF TORRINGTON v. TAYLOR

(No. 2239; May 25, 1943; 137 Pac. (2d) 621)

For the appellant there was a brief by *Paul B. Lorenz* of Cheyenne and *Samuel D. Menin* of Denver, Colorado, and an oral argument by *Mr. Menin.*

For the respondent there was a brief by *Hal. E. Morris* of Torrington, and an oral argument by *Mr. Morris*.

RINER, Justice.

These direct appeal proceedings draw in question a judgment and sentence of the District Court of Goshen County, Wyoming. The case was tried de novo in that court as an appeal from the Municipal Court of the town of Torrington, Wyoming. In the court last mentioned, the defendant, A. W. Taylor, was convicted of violating an ordinance of the town aforesaid upon a complaint charging that said defendant "on the 25th day of June in the year of our Lord, 1940, in the Town of Torrington, County of Goshen and State of Wyoming, did unlawfully create a disturbance by approaching public and private places of residence and with profane and abusive language insist on persons signing a petition of questionable character contrary to the ordinance in such case made and provided * * *."

The ordinance of said town under which this prosecution was conducted was numbered 88 and reads:

"Any person, who shall use any obscene, indecent or profane language in any private or public place within the corporate limits of the town of Torrington, to the disturbance or annoyance of any person, family, or neighborhood, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine in any sum not exceeding twenty-five dollars, and shall stand committed to the town jail until such fine and costs of prosecution are paid."

The proof submitted by the town in support of the complaint aforesaid was in substance as follows: The defendant, Taylor, on or about June 25, 1940 entered the place of business of one Wayne Cross, who was engaged in the business of running a cottage camp, so called. This place of business was established for the purpose of renting cabins, selling gasoline, and maintaining a small grocery store in connection therewith. Cross had living quarters in the rear of the store.

When Taylor entered the store there were a couple of its customers present drinking soda water. He was at the time engaged in circulating a petition on behalf of a sect designating themselves "Jehovah's Witnesses," said petition being addressed to the Governor of an eastern state and the Association in charge of the state fair grounds of that commonwealth. It appears by this petition that the Association aforesaid had at first granted permission to the sect above mentioned to hold a convention on the grounds controlled by the Association and thereafter this permission had been revoked. The petition itself embodied a protest against this action and also a request that the Association allow the convention to be held.

Taylor laid several duplicate copies of this petition upon the store counter and requested signatures. The proofs in the case fail to disclose that anything unusual was said at the time Taylor requested that the petition should be signed by the persons present in the store. The store proprietor undertook to examine the petition,

but not exactly comprehending its purport he asked Taylor several questions concerning its meaning to which the latter responded with the question, "Can't you read?" Mrs. Cross, the proprietor's wife, who was present also undertook to read the papers submitted and she likewise requested information concerning them and asked Taylor to explain the matter to her. To this request on the part of Mrs. Cross, Taylor said, "Jesus Christ! Can't you read?" Cross thereupon asked Taylor to leave the store and this he did after the request was repeated.

A "Criminal Complaint," as stated above, was shortly thereafter filed in the Municipal Court of the town of Torrington, a warrant was issued for Taylor's arrest, he was tried and found guilty by a jury of six men who rendered a verdict reading, according to the certified copy of the docket entries of the police justice "We, the jurors, find the defendant guilty of violating ordinances 88 and 165." The docket of justice, as certified aforesaid, further states:

"Fine: $25.00 on each of two counts. Making $50.00 court costs $2.50 Jury costs $45.00 making in all $57.00. Not having any money Dft was remanded to jail until fine and costs are paid. * * *"

The procedure in taking appeals from the Municipal Court of the town aforesaid to the District Court of Goshen County is required to be "in the manner now provided by laws for appeals from Justices of the Peace" (Section 22-1304 W. R. S., 1931). By Section 33-147 W. R. S., 1931, when an appeal from a Justice of the Peace is taken to the District Court, that officer is directed to "at least ten days before the first day of such term of the district court of the county, file in the office of the clerk thereof, a certified copy of the entries on his docket, together with all the undertakings and papers in the case."

An examination of the papers incorporated in the

record at bar in connection with a "certified copy of the entries" appearing on the docket of the police justice discloses that the original verified complaint upon which Taylor was tried in the Municipal Court was not filed in the District Court of Goshen County as required by the statute above quoted. Instead, what appears to be a copy of only a portion of that complaint was filed. This copy seems not even to have been signed by the party who verified the original complaint, but it appears to have all been written in the same handwriting. The signature line to this partial copy of the complaint on file in the Municipal Court presents merely the statement "Signed by F. C. Calhoun." So far as can be determined from the record before us, this man Calhoun evidently was the complaining witness in the case.

From what has been set forth hereinabove, it is clear that Taylor was tried in the District Court without a sworn complaint on file in that court against him. Through his counsel he saved an exception to this condition of the record before the witnesses in the cause gave their testimony. The statute requiring the original papers used in the Justice Court to be filed in the Office of the Clerk of the District Court to which an appeal is taken was, it is evident, disregarded. We are unable to approve such an omission to obey the law. To do so, would be to open the door too widely to imposing injustice and unfairness upon defendants in connection with appeals from the Justice of the Peace courts of this state.

It may be observed also that the facts proven as we have outlined them above fail to establish that Taylor did, as charged in the Criminal Complaint, "with profane and abusive language insist upon persons signing a petition of questionable character." When the defendant requested signatures to the petition, so far as the record in this case shows, he does not seem to have done this with any impropriety which transgressed the

ordinance aforesaid. So far as "abusive" language is concerned, there was none. Besides, that adjective is not to be found in the ordinance involved here as descriptive of language forbidden thereby. One of the definitions given by Webster's Dictionary of the word "questionable" is "dubious in nature or character; open to suspicion on ethical grounds; not of good repute"; another meaning ascribed to the word by the text just mentioned is "open to doubt or to being called in question; not sure exact or decided; problematical." We hardly think the petition aforesaid could be regarded as included within these definitions. It might very well be regarded as useless, but we do not think it should be considered as "open to suspicion" or "doubtful". Additionally, we find nothing in the ordinance dealing with a matter of this character.

Relative to the expression used by Taylor when Mrs. Cross asked him to explain the meaning of the petition, certainly the question "Can't you read?" is neither abusive nor profane. Does the use of the name of the Founder of the Christian Religion as an exclamation preceding the question without more constitute "profane language" within the meaning of the town ordinance?

8 Am. Jur. 701, § 12 states that: "Statutes relating to profanity are strictly construed." In 2 McQuillin, Municipal Corporations (2d Ed.) 1075, § 856, upon the authority of many cases, the rule is announced: "Ordinances are construed by the same rules that govern the construction of statutes."

The author of the exhaustive note appended to the case of Commonwealth v. Linn, 22 L. R. A. 353 (158 Pa. 22) says that:

"Profanity in its nature is a form of blasphemy; any words which amount to an imprecation of divine vengeance constitute the offense. * * *"

50 C. J. 635, Section 6, says that:

"Except where the statute makes it an essential element of the offense it is not necessary that the name of God should be used to constitute the offense, provided only the words used import an imprecation of divine vengeance or imply divine condemnation, as used with other words or under the circumstances in which they were spoken. If, under the circumstances, the words, when spoken, do not carry this meaning, there is no offense. * * *"

In Roberts v. State, 120 Ga. 177, 47 S. E. 511, the court very well said that:

"As a general rule, words are profane, or not, according to the sense in which they are used; and it is necessary to show by other words coupled with them the sense in which they are used, to make a valid charge of using profane language. * * *"

See also 34 Words and Phrases (Perm. Ed.) 199 et seq.

The United States Circuit Court of Appeals for the Ninth Circuit in Duncan v. United States, 48 Fed. (2d) 128, had under consideration the conviction of a defendant charged with violating an act of Congress reading in part:

"No person within the jurisdiction of the United States shall utter any obscene, indecent, or profane language by means of radio communication. * * *"
(47 U. S. C. A., § 109)

In the course of its opinion, the court stated as to what should be regarded as profane language that:

"The question of what constitutes profane language has been before the courts for centuries. The subject is usually dealt with as a branch of the common-law offense of blasphemy, but in the United States particularly it has been a frequent subject of legislation. In the Century Dictionary, 'profane' is defined as follows: 'Irreverent toward God or holy things; speaking or spoken, acting or acted, in manifest or implied con-

tempt of sacred things; blasphemous: as, profane language; profane swearing.' In Gaines v. State, 7 Lea (75 Tenn.) 410, 40 Am. Rep. 64, decided in 1881, the defendant was charged with uttering a profane oath in a public place, etc. It was said: 'Any words importing an imprecation of divine vengeance or implying divine condemnation, so used as to constitute a public nuisance, would suffice. Isom v. State, September Term, 1880; Holcomb v. Cornish, 8 Conn. 375' ".

Reviewing many authorities the court concluded its discussion of the matter and announced its views thus:

"Under these decisions, the indictment having alleged that the language is profane, the defendant having referred to an individual as 'damned,' having used the expression 'By God' irreverently, and having announced his intention to call down the curse of God upon certain individuals, was properly convicted of using profane language within the meaning of that term as used in the act of Congress prohibiting the use of profane language in radio broadcasting."

The judgment of conviction in the District Court of the United States for the District of Oregon was upheld.

Applying the rules announced by these authorities to the language quoted above on which the town relies to maintain the charge in the Criminal Complaint aforesaid, even if it had been used in requesting signatures to the petition aforesaid—though, as we have seen, it was not—we are convinced that it utterly lacked any "imprecation of divine vengeance" and did not "imply divine condemnation." As far as the definition contained in the Century Dictionary and quoted in the opinion in the Duncan case, supra, is concerned, it is far from clear that the words spoken were used by Taylor in "manifest or implied contempt of sacred things" or were "irreverent toward God or holy things." There is nothing in the record before us that would so indicate. It is true that the use of the exclamation aforesaid might wound the feelings of those

who heard it. That it did not aid Taylor in accomplishing his purpose of obtaining signatures to the petitions he was circulating but rather interfered with that purpose may well be so; and that under a different set of circumstances than those shown in this record, it would even be regarded as an instance of the use of profane language is likewise true. All that we adjudge in the instant case is that we do not think it was so employed here.

At common law we may note as of interest in this connection as stated in 50 C. J. 634 and cases cited that:

"In itself, however, independently of the circumstances giving it the character of a common nuisance, a single utterance of a profane word is not indictable at common law. * * *"

Other matters are urged for appellant, but we do not deem it necessary to extend this opinion by a consideration of them.

From our survey of the entire record herein and the authorities we have examined, we are obliged to reach the conclusion that the ends of justice will be better served by directing a reversal of the judgment and sentence of the District Court of Goshen County with instructions to dismiss the complaint in the cause.

*Reversed.*

KIMBALL, Ch. J., and BLUME, J., concur.