Emerick M. HUBER, Appellant
(Defendant),

v.

The CITY OF CASPER,
Appellee (Plaintiff).

No. 86–13.

Supreme Court of Wyoming.

Nov. 5, 1986.

Ronald L. Brown and Burton W. Guetz of Burke and Brown, Casper, for appellant.

Richard H. Peek, Casper, for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

URBIGKIT, Justice.

Emerick Huber appeals convictions, affirmed by a district court acting as an intermediate appellate court, of violating a Casper city ordinance enjoining leaving the scene of an accident and failing to report an accident. Based on ordinance interpretation, we reverse.

In the early hours of Easter morning, 1985, appellant Huber, Sharon Hedges, and off-duty Highway Patrol Officer Brad Ward were returning in appellant's van from a Casper nightclub, bound for appellant's office. Near the cemetery they spotted a young woman in the darkness who "looked like she was in trouble." Huber, the driver of the van, stopped to offer assistance. The girl "looked like she had been hit a couple of times," and "her face was pretty messed up. She had been crying and looked a little bit shaky." She explained that her boyfriend had beaten her up and left her at the cemetery, and asked for a ride to her mother's house. Since the young passenger did not know her mother's address, Huber slowly drove the streets of North Casper until she spotted the house. As established by the undisputed testimony of Huber, Hedges and Ward, Huber pulled the van onto the sidewalk, turned off the engine, and placed the keys in his pocket.

Ward, who had been seated on the passenger side of the vehicle, testified at trial that he and Huber supposed the abusive

boyfriend belonged to a motorcycle gang because, on the girl's arm, there was a "one percent" tattoo. He explained this curious emblem:

"[A] 1 percent is a tattoo that motorcycle riders wear which * * * goes back to * * when the American Motorcycle Association came out with a statement regarding motorcyclists and said that 99 percent of all motorcyclists are good, honest, upstanding citizens and only 1 percent of the motorcyclists are the outlaw gang type members * * * that give motorcyclists a bad name."

Ward got out to help their bruised passenger alight. Suddenly, out of the quiet night, there came a mechanized roar, and Ward looked up to see four motorcycles heading toward the van. Assuming that the lead motorcyclist was the boyfriend, and possibly a member of a "one percent" outlaw gang, with potentiality for violence, Ward pushed the girl back inside the van, jumped in beside her, and yelled to Huber to drive away. Huber started the motor but not until after the lead motorcyclist had slid into and hit the rear of the still parked van. The reason for the motorcyclist driving into the van is conjectural, although evidence revealed that his blood alcohol content, measured after the accident, was .25 per cent. This condition and the circumstance of the van parked in a narrow street were likely factors precipitating the collision.

Huber, Ward, Hedges, and the young girl, unsure whether or not there had been an accident or injuries, drove to the police station and, they claim, there reported the possible accident and deposited their guest.

Huber was charged with three criminal offenses: leaving the scene of an accident; failure to report an accident; and illegal parking. He was convicted in a trial to the court and fined a total of $1,530, and the convictions were affirmed on appeal by the district court. The appeal was pursuant to Rule 1.03, W.R.A.P., providing for appeal to the district court from decisions of municipal, justice of the peace, and county courts. The present appeal results from that intermediate court affirmance.

On appeal here, Huber contests only the City of Casper Ordinance 18–81 convictions, and not the illegal parking charge. In relevant part, Ordinance 18–81 states:

*"Section 1. Becoming Involved in an Accident and Leaving the Scene Without Giving Name and Address—Prohibited.*

"(a) It shall be unlawful and punishable as hereinafter provided, for any person to *operate* a motor vehicle within the corporate limits of the City of Casper, Wyoming * * * and become involved in an accident with another vehicle * * * and fail to take reasonable steps to locate and notify the driver * * * of his name and his address * * *.

"(b) *Driver* of a vehicle involved in an accident resulting in injury to or death of any person, * * * shall *as soon as practical thereafter* give notice of such accident to the Casper Police Department and provide his name, address and the location of said accident." (Emphasis added.)

The three factors involved in the convictions and appeal are "operate," "driver," and notice "as soon as practical thereafter."

Ordinance 18–81 is similar to §§ 31–5–1101 through 31–5–1105, W.S.1977 (1984 Replacement). The elements of § 31–5–1101, which statute prohibits leaving the scene of an accident without furnishing identification and rendering aid to injured persons, are: (1) driving a vehicle, (2) involvement of the vehicle in an accident with another vehicle, and (3) failing to stop at the scene of the accident, furnish identification and render assistance. See *Wood v. City of Casper,* Wyo., 683 P.2d 1147 (1984).

## LEAVING THE SCENE OF AN ACCIDENT

The first appeal question, whether appellant was *operating* a motor vehicle when the motorcycle impact occurred, will be answered by this court in the negative.

When construing a legislative enactment, we look at the specific language of the statute to discern legislative intent. *Wyoming State Department of Education v. Barber*, Wyo., 649 P.2d 681 (1982). The same rules which govern the construction of statutes apply also to the construction of ordinances. *Town of Torrington v. Taylor*, 59 Wyo. 109, 137 P.2d 621 (1943).

There is a "general rule that words of a statute are to be interpreted in their ordinary, everyday sense unless a contrary interpretation is indicated in the specific statute." *Adams v. State*, Wyo., 697 P.2d 622, 624 (1985). Another precept of construction is that a penal statute will not be extended by implication or construction to embrace persons not expressly subject to its application, and corollary to this precept is that "ambiguity concerning the application of criminal statutes should be resolved in favor of lenity." *Capwell v. State*, Wyo., 686 P.2d 1148, 1153 (1984). See *Attletweedt v. State*, Wyo., 684 P.2d 812 (1984), and *Horn v. State*, Wyo., 556 P.2d 925 (1976).

We examine, then, how, if at all, this ordinance applies to appellant. If he was operating the van when the collision occurred, in the sense contemplated by the language of the ordinance, then the judgment of the trial court may be correct if an insufficient report was made to the Casper police. The facts adduced at trial established that Huber pulled the van partially up onto the sidewalk, shut off the engine, and put the keys into his pocket before the vehicle impact occurred.

Plainly, the word "operate" is susceptible of several quite different meanings. "Operate" might have been used by the Casper City Council in a narrow sense, as a synonym for the word "drive," or it might have been used in the broadest sense, as an alternative for the phrase "in actual physical control of." See *Adams v. State, su-*pra.[1] It is impossible to finitely assess the intent of the City Council from the language of the ordinance because "operate" is multifaceted in linguistic application.[2]

The meaning of "operate" has not been previously addressed by this court, and we will therefore invoke authoritative guidance in our analysis. Black's Law Dictionary (5th ed. 1979) defines "operate" as: "To perform a function, or operation, or produce an effect." "Operate" is described in 60 C.J.S. Motor Vehicles § 6(2), p. 159:

> "The word 'operate' may denote a personal act in working the mechanism of the car and refer to the physical handling of the controls of the vehicle; the physical act of working the mechanism of the car; and the term is defined as meaning to regulate and control the management or operation of the car, that is, to have charge of it as the driver."

The Annotation at 93 A.L.R.3d 7, § 3[b] addresses the meaning of "operate" when not in the context of driving while intoxicated:

> "[Two] definitions of 'operate' that have appeared in a significant number of cases are the following: (1) 'operate' includes not only the motion of the vehicle but also acts which engage the machinery of the vehicle that, alone or in sequence, will set in motion the motive power of the vehicle; (2) a person operates a motor vehicle when he intentionally does any act that makes use of any mechanical or electrical agency which alone or in sequence will set in motion the motive power of that vehicle * * *."

See also *State v. Graves*, 269 S.C. 356, 237 S.E.2d 584 (1977).

This court deems this reasoning and criteria persuasive. "Operation" means more than mere presence in a vehicle. We hold, then, that where a person is occupying the driver's seat of a motor vehicle and

---

1. Illustrative is Wyoming's all-inclusive definition of "driver" in § 31–5–102(a)(x), W.S.1977 (1984 Replacement):

   " 'Driver' means every person who drives or is in actual physical control of a vehicle."

2. In Burton's Legal Thesaurus (1980) there are 67 synonyms for "operate." In Webster's New International Dictionary, Unabridged (1971) there are likewise a dozen or more definitions for this verb.

that vehicle is stationary in a designated parking zone or otherwise not occupying a traffic lane or impeding the flow of traffic, and the engine is switched off, that person is not operating the vehicle. This decision is in accord with precepts of statutory construction. We merely interpret "operate" in its "ordinary, everyday sense." *Adams v. State, supra,* 697 P.2d at 624. All of this is only to say that, in defining phraseology of the nature of the Casper ordinance, for purposes of leaving the scene of an accident a parked vehicle is not being operated when hit while standing at the curb.[3]

## FAILURE TO REPORT AN ACCIDENT

The second aspect of this appeal is whether appellant was a "[d]river of a vehicle involved in an accident," and, if so, was Huber's report to the police sufficient to satisfy the notice requirements of subsection (b) of the city ordinance:

"Driver * .* * shall as soon as practical * * * give notice * * * to the police and provide his name, address and the location of said accident."

Our examination of the record reveals that we can only speculate as to the sufficiency of the report given to the police, since no police blotter notation was made of the incident and the trial testimony of the dispatch officer was indefinite and conflicted with the testimony of other witnesses. Our discussion of "operate" is dispositive, and, as it is unlikely that a similar factual circumstance will reoccur, we will not address this subject further.

A defense has been suggested under the facts of this case to be available if Huber realized that there had been an accident and then recognized that he could have been endangered by the motorcyclists if he did not expeditiously leave the north Casper location at that hour of the night. The test which applies is what a reasonable person would do under similar circumstances, and this defense could be raised if Huber's report immediately after the accident was consequently delayed. As an example, see *Isom v. State,* 37 Ala.App. 416, 69 So.2d 716 (1954), where a black motorist involved in an accident with a white motorist was threatened with death, fled the scene, and was convicted of leaving the scene of an accident. The Court of Appeals of Alabama reversed on the basis of a refused instruction incorporating the reasonable-fear-as-justification defense. The court said:

"According to the testimony of the defendant he was confronted with danger to life or great bodily harm. It would be unjust and unreasonable to declare that, despite this, he was required to remain at the scene and go through the formality of complying with each and every requirement of the statute." 69 So.2d at 718.

See also *State v. Goff,* 79 S.D. 138, 109 N.W.2d 256 (1961). For discussion of the "choice of evils" defense of necessity, see, among others, *People v. Trujillo,* 41 Colo. App. 223, 586 P.2d 235 (1978) (prison escape); *People v. Robertson,* 36 Colo.App. 367, 543 P.2d 533 (1975) (prison escape); *Esquibel v. State,* 91 N.M. 498, 576 P.2d 1129 (1978) (prison escape); and *State v. Diana,* 24 Wash.App. 908, 604 P.2d 1312 (1979) (medical necessity).

The defense was available; its sufficiency need not be judged in view of the criminal-law standards and the decision of the trial court since we otherwise determine this appeal on the first issue. Here, be-

---

**3.** Carefully, the decision of this court was determined on the uncontroverted status and undisputed fact that Huber was not in violation of the City ordinance as a matter of law, since he was not *operating* the van when it was hit by the intoxicated motorcyclist. Contrariwise, the comments of the dissent encompass an interesting discussion on social issues involving intimated behavior. This court does not create crimes for justification of prior conviction.

Likewise, our decision today has no application to a person charged with violating laws proscribing operating or driving while under the influence of intoxicants, where a difference in statutory phraseology and construction is found. It does seem paradoxical that Huber was cited for both illegal parking and illegal operation of a motor vehicle, since ordinarily these are mutually exclusive offenses.

cause appellant was not an "operator" of a motor vehicle, appellant's convictions for violating City of Casper Ordinance 18–81, §§ 1(a) and 1(b) are reversed, and the case is remanded for entry of a judgment in accord herewith.

Reversed.

THOMAS, Chief Justice, concurring.

I concur in the result of this case. It does seem to me that subsection (b) of City of Casper Ordinance 18–81 may intend a more passive role than that contemplated by subsection (a) of that ordinance. I agree with the majority opinion that Huber was not an operator of a vehicle at the time of the accident in question. I am not so sure that Huber was not a driver of a vehicle when it became involved in the collision.

Nevertheless I would resolve the case in the same way because it is my opinion that the evidence before the court demonstrated that Huber, Hedges and Ward, singularly or collectively, had in fact given notice of the accident to the Casper Police Department, provided Huber's name and address, and advised of the location of the accident. The contrary testimony is at best equivocal, and the circumstances certainly indicate that somehow or other a response was made to the occurrence of this accident. Consequently, the evidence would not justify a conclusion of failure to report an accident beyond a reasonable doubt.

BROWN, Justice, dissenting.

All that is expected of Dr. Huber is that he obey the law the same as anyone else. If Dr. Huber had called an emergency vehicle and reported the accident, he likely would have been cited as the "hero next door," rather than cited for criminal offenses.

For reasons of his own Dr. Huber fled the scene of the accident, then gave an evasive, incomplete and false account of what happened.

"Oh, what a tangled web we weave when first we practice to deceive." Sir Walter Scott

The Casper Police Department is to be complimented for not caving in to pressure and sweeping the Huber affair under the rug.

Appellate courts must be ever vigilant and not succumb to the temptation of weighing and evaluating the evidence and substituting its judgment for that of the trier of fact. There are sound reasons for rules against retrying a case in an appellate court. These reasons are so well known that I need not restate them here.

The easiest way to avoid the appearance of weighing and evaluating the evidence is to omit part of it. The majority has related the evidence and accepted inferences most favorable to Dr. Huber. This is contrary to the most fundamental appellate rules.

" * * * On appeal, we assume the evidence in favor of the successful party to be true, disregarding entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it. [Citations.]" *Lewis v. State*, Wyo., 709 P.2d 1278, 1282 (1985).

See also, *Wood v. City of Casper*, Wyo., 683 P.2d 1147 (1984).

In order to reach its verdict [1] the majority turned around the basic appellate rule just referred to. For the purposes of this case the majority effectively rewrote a basic appellate rule to read:

On appeal, we assume the evidence in favor of the convicted defendant to be true, disregarding entirely the evidence of the prosecution in conflict therewith, and give to the evidence of the convicted defendant every favorable inference which may be reasonably and fairly drawn from it.

If the proper appellate rule had been applied, the court would have accepted as true the following evidence.

---

**1.** I use the term "verdict" because the majority assumed the role as the trier of fact.

After frolicking at the Moonlight Lounge for about two to two and one-half hours, appellant Dr. Emerick Huber, Sharon Hedges and Wyoming Highway Patrolman Brad Ward decided to quit the lounge and repair to Dr. Huber's office. As the threesome proceeded toward Dr. Huber's office they saw a person standing at the side of the road apparently in distress. This person was described by Patrolman Ward as a "young female girl." Good samaritan instincts welled up inside the trio, and Dr. Huber, who was driving his van, stopped to talk to the girl. I refer to this mystery woman as "the girl" because no one seems to know who she was.

The girl appeared to have sustained an injury, but did not want to go to the hospital or police station, but rather, wanted to be taken to her mother's home. A minor problem was that the girl did not know for sure where her mother lived. She told the occupants of Dr. Huber's van that if they took her to north Casper she could find her mother's house.

In any event, the girl got in the van and Dr. Huber drove to north Casper to a point near the intersection of Beech and H Streets where he parked half way on the sidewalk. Ms. Hedges was in the front passenger seat and Patrolman Ward in the back seat behind Ms. Hedges. What happened thereafter is slightly in dispute. In their testimony Sharon Hedges hedged, and Dr. Huber and Officer Ward were evasive.

According to the correct standard of review, the trial court was entitled to believe that Officer Ward and the young female girl started to get out of the van. At this juncture the occupants heard what they thought to be motorcycles coming up behind side them. Dr. Huber at no time got out of the van, and Officer Ward told him to leave. With respect to the scene of the accident Dr. Huber testified:

"Q. So you were the only one that had control of the vehicle.

"A. Correct, at all times."

A loud noise or a clattering sound was heard and a riderless motorcycle was seen sliding across the street, going past the van. At this time Ms. Hedges thought the loud noise was a collision. The motorcyclist, Mathew Keck, who hit the van, testified that as he approached it he didn't see anyone outside the van. At one time Keck told the police that "it [the van] was probably just barely moving." Keck also testified that his bike slid a little past or underneath the vehicle he struck, and when he came to rest he was about four feet from his bike. The motorcycle came to rest across the street, ahead of the van. Neither Dr. Huber nor Officer Ward checked the area nor the motorcycle. Dr. Huber drove the van away from the scene just described. Later, Dr. Huber told Ms. Hedges that "[T]he guy on the motorcycle must have hit the back of the van."

After leaving the accident scene the injured girl was deposited at the police station. While the trio was at the police station they inspected the van and saw that it had been damaged, and suspected that it had been involved in a collision with the motorcycle.

Dr. Huber and Officer Ward told Patrolman Sergeant Lowe at the police station that a woman with them had been assaulted. In connection with this visit to the police station, Sergeant Lowe was asked:

"Q. Did either Officer Ward or Doctor Huber tell you that they had been involved in a collision with a motorcycle?

"A. I believe Mr. Ward stated—during the time of our walk from the police station outside he mentioned that a biker had wiped out. And I asked, 'Well, what do you mean by wiped out?' And he simply said that he tipped his bike over. And I asked if he knew if the biker was hurt. And he said he did not think so. And then one of the gentlemen—I don't know which one—added that he may have hit the van. I said, 'Was there any damage, anyone hurt?' And the response was, 'We don't think so.' And I replied that if there is, please let us know if there is any problem with regard to damage or injury.

\*      \*      \*      \*      \*      \*

"Q. You [Sergeant Lowe] were not shown any damage to the van?

"A. No, sir.

"Q. And it was just in passing that they said that they think the van may have been hit?

"A. That was the statement that I heard, yes.

"Q. At any time did they come back and talk to you about the van actually being involved in the accident?

"A. No, sir. The only added statement was after they stated the van may have been hit is that they thought the biker may have been after the girl that they had picked up and they did not stay to find out what was going on.

"Q. At the time the van left, did you know the license plate number or the name of the driver of the van?

"A. No, sir. I had [no] information on that.[2]

"Q. Did have you [sic] the accident location?

"A. No, sir.

"Q. They didn't give you any of that information.

"A. No, sir."

This casual conversation between Officer Lowe and Dr. Huber and/or Officer Ward is the accident report that the majority apparently deems sufficient to satisfy the ordinance.

The so-called report is not only incomplete and equivocal, but is false. When Dr. Huber was at the police station he knew there had been damage to his van. Also, it is doubtful that he was completely honest when he said he did not think anyone was hurt. A loud clanging noise was heard at the rear of the van at the accident scene. This was followed by a riderless motorcycle sliding past the van across the street and coming to rest twenty or thirty feet in front of the van.

Dr. Huber would have the trial court believe that some phantom driver drove this motorcycle into the rear of the van, then vanished unharmed. Under the circumstances described by the occupants of the van it is inconceivable that the operator of the motorcycle could have escaped injury, yet Dr. Huber and his people said they didn't think anyone was injured.[3]

Ms. Hedges, Officer Ward and Dr. Huber left the police station and went to the latter's office. There the van was again examined by Dr. Huber and Officer Ward, and one or the other said, " * * * [T]hat guy had hit the back of the van on the motorcycle."

The threesome then returned to the accident scene where they saw an ambulance and other emergency vehicles, but they did not stop. They returned to the accident scene in Officer Ward's vehicle because they did not want the van to be recognized.

Officer Brian Sanborn of the Casper Police Department investigated the accident involving Dr. Huber. At the scene he found the driver within a foot or two of the motorcycle. The driver, Mathew Keck, was suffering from a broken arm and leg. The motorcycle driver said he suffered four broken bones. The day after the accident, April 7, 1985, *at the request of Wyoming Highway Patrolman Ward*, he and Officer Sanborn rendezvoused near a Casper hardware store. Patrolman Ward had a copy of Officer Sanborn's accident report. Ward said that he could give Sanborn more information about the accident. Officer Ward then asked Sanborn not to say anything about what he was going to tell him. Regarding the meeting, Sanborn testified:

" * * * [H]e [WHP Ward] started telling me that he had been out with a girl that night and that they had met with Emerick. And I didn't know who Emerick was. I asked him who Emerick was, and he said Emerick Huber. He told me that he was Judge Huber's brother and that

2. The word "no" was omitted from the written transcript, but is on the tape of the trial proceeding.

3. This story is about as incredible as that of the man who had been a piano player in the parlor of a bawdy house for thirty years and said he didn't know what was going on upstairs.

they had picked this girl up on Conwell that had been beaten and that they were going to take the girl home down there on H Street and while they were parked there on H Street, that he had thought the right side handlebar of the motorcycle had hit their van and that they—the reason they left was that they believed that they were bikers.

"Q. Let me go back. What did you say about believing the motorcycle hit the van?

"A. He told me that he believed the right side handlebar of the motorcycle had hit the van, and that's where the body bondo had come from that we found at the scene. He told me about them thinking that they were bikers and that the girl they had taken down there, that she had a 1 percent tattoo mark on her hand and that he thought she was part of the motorcycle gang, that they was chasing them.

"He went on to say that they had taken the girl down to the police station and met with Sergeant Lowe and Sergeant Lowe took the girl and that they had told Sergeant Lowe about the accident itself.

"Q. Did he at any time tell you that he had showed Sergeant Lowe the damage to the van?

"A. He said that they had pointed out the damage to the van. He didn't say if it was him or if it was Mr. Huber.

"Q. At any point did you say anything to the officer about keeping this off the record or not saying anything to anyone?

"A. I told him that I was going to have to talk to Sergeant Lowe and see what he knew about the accident and I would have to complete reports on the information that he just give me and I would probably have to talk to the lieutenant, which was the watch commander, being as it involved another agency now.

"Q. What happened then?

"A. He emphasized again that he wished that I could keep it quiet and not say too much about it because he was in fear that the type of job that he had, it could mean repercussions for him and

that if these bikers found out about—or this kid—after I told him it was a kid—found out that Emerick Huber was a doctor, that maybe they would want to sue him or something like that."

Officer Sanborn testified that he had a conversation with Dr. Huber. Sanborn said:

" * * * I had told him [Dr. Huber] that Ward had told me that the reason he didn't want me to say anything was because that Ward had said that Mr. Huber was afraid of being sued civilly if this got out and that Ward was afraid for his job. And Mr. Huber was quiet for a few minutes and thought about it. And he said that they had talked to their attorney and they talked to his brother, Mike Huber, and that they all felt that they didn't have anything to worry about and for them just to keep their mouth shut and not to say anything about it."

At trial Sharon Hedges testified:

"Q. Do you recall telling them during that conversation that Doctor Huber at no time got out of the van?

"A. Yes.

    *     *     *     *     *     *

"Q. At any time have you spoken with Brad Ward about this incident?

"A. Yes.

"Q. Do you recall when that was with respect to the incident?

"A. One time a couple of days after and a couple of times after I talked to the police.

"Q. Did he at any time tell you not to say anything to anyone about this incident?

"A. The first time, yes.

"Q. What did he tell you?

"A. He asked me if I had told anybody, and I said no, and he asked me not to mention it.

"Q. Was this the following Monday?

"A. I believe it was Tuesday."

If the proper standard of review is employed, the trial court could properly believe that Dr. Huber drove his vehicle to

the scene of the accident and that he temporarily parked it or slowed down; that he never got out of the vehicle and was always in control; that after being hit in the rear by the motorcycle he drove by the motorcycle, lying on its side, and that the motorcycle driver was within two to four feet of the motorcycle; that Dr. Huber saw damage to his van at the police station; that his account of the accident at the police station was evasive, incomplete, false and did not comply with the requirements of an accident report.

The trial judge, Jerry A. Yaap, is an experienced, capable judge and lawyer, and it is small wonder that he did not believe Dr. Huber's incredible explanation. Dr. Huber would have the trial judge believe that a phantom motorcycle gang was pursuing him; that after he stopped, if he did, some force, not unlike the sinister force that erased the Nixon tapes, removed the vehicle from harm's way; that Dr. Huber was fearful of further pursuit by the mysterious motorcycle gang on the way to the police station, into the next day and perhaps even now. Because of his fear of the motorcycle gang, Dr. Huber didn't want anyone to find out about the accident or who he was? Dr. Huber's friend did not want the Casper police to do anything about the accident, again, because of the fear of the motorcycle gang and his job?

Where is this phantom motorcycle gang? What "force" removed Dr. Huber's vehicle from the accident scene? There is not the slightest indication in the record that there was ever a motorcycle gang, except in Dr. Huber's head.[4]

"The wicked flee when no man pursueth: but the righteous are bold as a lion." Proverbs 28:1.

Dr. Huber can hardly be faulted for not wanting the Casper police to know a great deal about the phantom motorcycle gang or the sinister force that removed him from harm's way. It must be remembered what happened to Jimmy Carter when he reported that an amphibious rabbit attacked him.

---

**4.** Perhaps Dr. Huber is the apocryphal football fan sitting in the stadium, who, upon seeing the

I would affirm the intermediate court of appeals in its affirming the trial court.

team huddle to call signals, thought they were plotting against him.