**ALLIED–SIGNAL, INC., a Delaware Corporation, Appellant (Petitioner),**

v.

**The WYOMING STATE BOARD OF EQUALIZATION, Appellee (Respondent).**

No. 90–97.

Supreme Court of Wyoming.

June 12, 1991.

Gregory C. Dyekman, Dray, Madison & Thomson, P.C., Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., and Michael L. Hubbard, Sr. Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

THOMAS, Justice.

The essential question to be resolved in this case is the value to be ascribed to stock in a new corporation that is exchanged for the assets of sister corporations for purposes of the state sales tax. In a time period spanning part of 1985 and part of 1986, a corporate reorganization was structured in which the assets held by wholly owned subsidiary corporations were exchanged for 100 percent of the stock in a newly formed subsidiary corporation with no assets. In addition, the acquiring corpo-

ration assumed certain liabilities. The Wyoming State Board of Equalization ruled that this transaction was a transfer for consideration and subject to the imposition of the sales tax under the laws of Wyoming in effect at that time. The district court upheld the ruling by the State Board of Equalization which assessed the sales tax at $2,838,767. We acquiesce in the determination that, under the law in effect at that time, this was a transfer for consideration resulting in a sales tax. We hold, however, that the only consideration paid for the assets was the stock of the acquiring corporation and that, while certainly that stock was worth at least the expenses of capitalization, the record is silent as to that amount. Therefore, there is no proof of the value of the consideration paid for the assets. The net effect is that the stock that was transferred has no value according to this record, and there is no basis upon which to impose a Wyoming sales tax on this transaction. The judgment of the district court is reversed.

Allied–Signal, Inc. (Allied–Signal), presents the following issues for review:

"A. Whether the District court erred in sustaining the finding of the State Board of Equalization that the subject transaction constituted a 'Sale' within the meaning of Wyo. Stat. § 39–6–402(a)(iii).

"1. Whether the legislature did not intend to subject such transfers to tax.

"2. Whether the District Court erred in concluding that Appellant did not carry its burden of proving a longstanding policy of the department.

"3. Whether the District Court erred in concluding that the statute is not ambiguous.

"4. Whether the ambiguity in the meaning of the term 'consideration' as it applies to an incorporation transfer should be resolved by this court finding that the stock received upon an incorporation transfer is not consideration for purposes of the Act.

"B. Whether the imposition of tax on Allied's transfer was in violation of the Wyoming Administration Procedure Act and the due process provisions of

the Wyoming and Federal Constitutions.

"C. Whether, even if the subject transaction constituted a 'sale,' the State Board of Equalization acted arbitrarily, capriciously and contrary to law in finding that the intrinsic value of the stock received by Allied, and therefore the amount subject to tax, was greater than zero and the District Court erred in sustaining that finding."

The Wyoming State Board of Equalization (Board), as appellee, sees the issues in this way:

"Has the appellant carried its burden of proving that the board's decision is contrary to the standards established for this review under W.S. 16-3-114(c)?

"(1) Is W.S. 39-6-402(a)(iii)(1986) ambiguous?

"(2) Does the rule of construction cited by appellant apply? If so, does it change the result of this case?

"(3) Is the decision supported by substantial evidence?"

In September of 1985, Allied–Signal acquired Allied Corporation (Allied), which was a public corporation involved in the chemical, automotive, and aerospace industries. Allied became a wholly-owned subsidiary of Allied–Signal. One of the major assets of Allied was a soda ash mining and manufacturing facility located near Green River. In December of 1985, Allied–Signal caused One Newco to be incorporated under the laws of the state of Delaware. The officers and directors of this new company were composed of either officers or employees of Allied or one of its affiliates.

One Newco became an active entity on May 21, 1986 when Allied transferred its Wyoming soda ash business plus the assets of various other chemical companies to One Newco in exchange for the entire first issue of One Newco stock. In addition, One Newco assumed certain liabilities incurred earlier by Allied in connection with the assets that were transferred. Prior to that time, One Newco had acquired no assets whatsoever and, as a result of the transaction, it became a wholly-owned subsidiary of Allied. Through this arrangement, Allied continued to maintain control and ownership of the assets and businesses transferred to One Newco. Allied Signal was the corporate owner of Allied, and it possessed ultimate control and ownership over the entire business structure that included One Newco. Allied Signal's asset pool was not affected by the exchange of property for stock other than to the extent of some ostensible increase in net worth reflected by a return of the intrinsic value contained in the incorporation of One Newco. One Newco changed its name to General Chemical Corporation following the transaction.

As a part of the transfer of assets for stock, Allied assumed liability for all taxes associated with the formation of One Newco. Allied reported the transfer on its May, 1986 sales tax return and remitted sales tax in the amount of $2,858,593. The following January, it filed an amended return and requested a refund of $2,838,767 from the Wyoming Department of Revenue and Taxation (Department) on the ground that the exchange of assets of Allied for One Newco stock did not constitute a taxable event. The request for refund was denied and, on appeal, the Board ruled that the transfer did constitute a "sale" and that the stock received by Allied amounted to consideration, thus upholding the Department's denial. In order to establish the amount of taxes due, the stock was found to be worth the value of the assets received.

Subsequently, Allied and Allied–Signal merged and Allied–Signal became the successor in interest to all claims previously initiated by Allied. In August of 1989, Allied–Signal petitioned the district court to review the order of the Board. The district court affirmed the agency's determination.

At the time of the transaction upon which the tax was imposed, the controlling Wyoming law, found in § 39–6–402(a)(iii), (iv), and (v), W.S.1977, (May 1985 Repl.), reads as follows:

"(a) As used in this article:

   *      *      *      *      *      *

"(iii) 'Sale' means any transfer of title or possession for a consideration and includes the fabrication of tangible personal property when the materials are furnished by the purchaser;

"(iv) 'Sales price' means the consideration paid by the purchaser of tangible personal property excluding the actual trade-in value allowed on tangible personal property exchanged at the time of transaction, admissions or services which are subject to taxation as provided by this article and excluding any taxes imposed by the federal government or this article;

"(v) 'Tangible personal property' means any property not real or intangible * * *."

It is to be noted that the statute defines a sale as any transfer of title or possession for a consideration and then describes the sales price as a consideration paid by the purchaser. These provisions were promulgated initially with the Selective Sales Tax Act of 1937, Ch. 102, 1937 Wyo. Sess. Laws, but the provision was not enforced to impose a tax upon the contribution of assets to a wholly-owned subsidiary in exchange for the stock of the subsidiary until 1982. In that year, the Wyoming Telephone Company contested case culminated in an affirmation by the Board of an assessment made on exactly such an exchange. The case involved a factual situation quite similar to that involved in this case, but the disputed tax was $584.23. The Board's ruling was not appealed. *See The Wyoming Lawyer*, Vol. VI, No. 2, (June 1983) (reviews the Administrative decision).

The testimony of the director of the Internal Operations Division of the Department of Revenue and Taxation in this case is to the effect that the Department, at least prior to the 1982 case, had believed that a transfer upon an incorporation such as that occurring in this instance would not be the subject of a sales tax assessment. In 1985, however, the Department, apparently upon its conclusion that its prior interpretation of the statutes had been either erroneous or lax, adopted Chapter III, Section 5 of the Rules and Regulations of the Wyoming State Tax Commission, in which a transfer of tangible personal property pursuant to the sale of a business was declared to be subject to the sales tax.

At the next general session of the legislature following promulgation of the new regulation by the Department, the legislature, apparently reacting to the Department's changed posture, expanded the language of the applicable statutes to establish express exceptions for certain types of transactions. Section 39–6–402(a)(iii), (iv), and (v), W.S.1977 (July 1990 Repl.), in pertinent part, now read as follows:

"(a) As used in this article; * * *

* * * * * *

"(iii) 'Sale' means any transfer of title or possession for a consideration including the fabrication of tangible personal property when the materials are furnished by the purchaser but excluding an exchange or transfer of tangible personal property upon which the seller has directly or indirectly paid sales or use tax incidental to:

* * * * * *

"(B) The formation of a corporation by the owners of a business and the transfer of their business assets to the corporation in exchange for all the corporation's outstanding stock, except qualifying shares, in proportion to assets contributed;

* * * * * *

"(E) The transfer of assets from a parent corporation to a subsidiary corporation which is owned at least eighty percent (80%) by the parent corporation, which transfer is solely in exchange for stock or securities of the subsidiary corporation;

"(F) The transfer of assets from a subsidiary corporation which is owned at least eighty percent (80%) by the parent corporation to a parent corporation or to another subsidiary which is owned at least eighty percent (80%) by the parent corporation, which transfer is solely in exchange for stock or secu-

rities of the parent corporation or subsidiary which received the assets;

\* \* \* \* \* \*

"(K) The transfer of assets between parent and closely held subsidiary corporations, or between subsidiary corporations closely held by the same parent corporation, or between affiliated companies, partnerships and corporations which are owned in similar percentages by the same persons. 'Closely held subsidiary corporation' means a corporation in which the parent corporation owns stock possessing at least eighty percent (80%) of the total combined voting power of all classes of stock entitled to vote and owns at least eighty percent (80%) of the total number of shares of all other classes of stock;

\* \* \* \* \* \*

"(M) The sale of a business when sold to a purchaser of all or substantially all of the assets of the business when the purchaser continues to use the tangible personal property in the operation of an ongoing business.

"(iv) 'Sales price' means the consideration paid by the purchaser of tangible personal property excluding the actual trade-in value allowed on tangible personal property exchanged at the time of the transaction, admissions or services which are subject to taxation as provided by this article and excluding any taxes imposed by the federal government or this article;

"(v) 'Tangible personal property' means any property not real or intangible; \* \* \* ."

Pursuant to these provisions, an exchange of assets like that involved in this case would not be taxable. The new language in the statutes precludes such a result.

In support of its position that the transaction was not taxable, Allied–Signal argues that the district court erred in sustaining the ruling of the Board because the exchange of assets that occurred in the transaction sought to be taxed simply is not a "sale" within the contemplation of § 39–6–402(a)(iii) even under the language

found in the statute at the time this transfer occurred. The construction that Allied–Signal wishes to have applied is that the statutory language can be harmonized if the word "consideration," as it appeared in the statute, is held not to include stock or other corporate assets when they are exchanged in a transfer that is part of a new incorporation. Allied–Signal, in support of this urged construction, points to the prompt amendment by the legislature to provide exemptions from the regulations promulgated by the Board that reached this transaction. Allied–Signal argues that this circumstance, when considered in the context of a long-standing silence that apparently manifested acquiescence in the Department's past refusal to tax such transfers, demonstrates ineluctably that transfers such as the one between Allied and One Newco were not intended to be taxed even before the protective amendments had been accomplished. See *State Board of Equalization v. Tenneco Oil Company*, 694 P.2d 97 (Wyo.1985); *Town of Pine Bluffs v. State Board of Control of State of Wyoming*, 647 P.2d 1365 (Wyo. 1982).

Allied–Signal's legal theories hinge on the premise that the intent that is manifested by the circumstances in regard to legislative action, or inaction as the case may be, mandates a conclusion that incorporation transfers like this one should not be taxed. Allied–Signal argues that statutes must be applied and enforced according to the intent of the legislature and discounts the fact that the statutory language in vogue at the time failed to inhibit taxation by the Department and, in fact, even apparently suggests it. As a further argument in support of its approach, Allied–Signal urges that the version of the statute in effect at the time this transaction occurred is ambiguous *per se* and thus, demands construction. This argument is derived primarily from *Tenneco* and hinges upon the long interpretation by the Board in a fashion contrary to that ultimately applied. *See Tenneco. Cf. Basin Electrical Power Cooperative v. State Board of Control*, 578 P.2d 557 (Wyo.1978) (divergent conten-

tions by parties can be evidence of ambiguity). Allied–Signal invokes this latter argument in an effort to refute plain language in the statute and avoid the interpretation that would justify the imposition of the disputed tax.

These arguments were rejected in the district court because of the conclusion of that court that the pertinent statutory language was unambiguous and neither required nor permitted construction to reach a determination of legislative intent. The trial court also ruled that Allied–Signal, in spite of its allegations to the contrary, had failed to prove the existence of the long-standing departmental policies it claimed were indicative of the ambiguity that would justify a different ruling. *See Tenneco.* The district court also alluded to various administrative decisions, though they were not named, that, in the judge's view, cast doubt on Allied–Signal's stance, and the court then ruled that the language of the statute mandates that an incorporation transfer is a taxable event. This is the position that the Board espouses in its argument in support of the rationale of the district court.

Allied–Signal has now chosen to rest its case on the position previously described. It also contends that the imposition of the tax on this transfer is contrary to the Wyoming Administrative Procedure Act and the due process provisions of both the federal and the state constitutions. Furthermore, it contends that the Board acted arbitrarily, capriciously, and contrary to law in determining that the value of stock received by Allied in exchange for its assets was greater than zero. This last argument, in a different context, becomes the persuasive position in this case.

■■■ We must invoke the rule that this court looks only to the intent of the legislature when enforcing or construing statutes. *Billis v. State,* 800 P.2d 401 (Wyo. 1990); *Rocky Mountain Oil and Gas Association v. State Board of Equalization,* 749 P.2d 221 (Wyo.1987); *Tenneco; McGuire v. McGuire,* 608 P.2d 1278 (Wyo. 1980); *Woodward v. Haney,* 564 P.2d 844 (Wyo.1977). The rule is absolute and con-

trolling. Strict adherence to our Wyoming constitution demands that the judicial branch of government recognize that it is without discretion, nor does it have any latitude, to apply statutes contrary to legislative intent once that intent has been ascertained.

■■■ Legislative intent must be ascertained initially and primarily from the words used in the statute. *Phillips v. Duro–Last Roofing, Inc.,* 806 P.2d 834 (Wyo.1991); *Wyoming Workers' Comp. v. Halstead,* 795 P.2d 760 (Wyo.1990); *Halliburton Co. v. McAdams, Roux & Associates, Inc.,* 773 P.2d 153 (Wyo.1989); *Dept. of Revenue and Taxation of State of Wyo. v. Hamilton,* 743 P.2d 877 (Wyo.1987); *Huber v. City of Casper,* 727 P.2d 1002 (Wyo. 1986); *In re Adoption of MM,* 652 P.2d 974 (Wyo.1982); *Oroz v. Hayes,* 598 P.2d 432 (Wyo.1979); *Seyfang v. Board of Trustees of Washakie County School Dist. No. 1,* 563 P.2d 1376 (Wyo.1977). When the words used are clear and unambiguous, a court risks an impermissible substitution of its own views, or those of others, for the intent of the legislature if any effort is made to interpret or construe statutes on any basis other than the language invoked by the legislature. Our precedent demonstrates that this rule also is an absolute. If the language selected by the legislature is sufficiently definitive, that language establishes the rule of law. Any additional construction can be resorted to only if the wording is ambiguous or unclear to the point of demonstrating obscurity with respect to the legislative purpose or mandate. *Blue Cross Ass'n v. Harris,* 664 F.2d 806 (10th Cir.1981); *Johnson v. Statewide Collections, Inc.,* 778 P.2d 93 (Wyo.1989); *Wyoming Insurance Dept. v. Avemco Ins. Co.,* 726 P.2d 507 (Wyo.1986); *Campbell v. State,* 709 P.2d 425 (Wyo.1985); *Tenneco.* This inhibition upon statutory construction offers assurance that the legislative efforts and determinations of elected representatives will be made effective without judicial adjustment or gloss.

■■■ We previously have articulated the proposition that a statute is ambiguous only if it is found to be vague or uncertain

and subject to varying interpretations. *Story v. State,* 755 P.2d 228 (Wyo.1988) *cert. denied* — U.S. ——, 111 S.Ct. 106, 112 L.Ed.2d 76 (1990); *Caton v. State,* 709 P.2d 1260 (Wyo.1985); *McArtor v. State,* 699 P.2d 288 (Wyo.1985); *Attletweedt v. State,* 684 P.2d 812 (Wyo.1984); *Matter of Reed's Estate,* 672 P.2d 829 (Wyo.1983). The converse of this proposition is that the statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability. The question of whether an ambiguity exists in a statute is a matter of law to be determined by the court.

■ We are unable to discern pertinent language in this instance that is susceptible to more than one interpretation. The words set forth in the statute are apt and are adequately definitive of the rule intended by the legislature. Thus, as a matter of law, we are foreclosed from any resort to rules of construction that rely on extrinsic events. *See Longfellow v. State,* 803 P.2d 1383 (Wyo.1991); *Tenneco; Jahn v. Burns,* 593 P.2d 828 (Wyo.1979); *Zanetti Riverton Bus Lines, Inc. v. State Board of Equalization,* 485 P.2d 387 (Wyo.1971). Even though the legislature did not act before the Board's rules were published, and did act promptly thereafter, that circumstance cannot be relied upon in this instance in construing the relevant provisions of the applicable statutes, § 39–6–402(a)(iii), (iv), (v), W.S.1977 (May 1985 Repl.). The language of the statute leads to no different result than the conclusion that the legislature's intent at the time the statutes were enacted was that corporate exchanges like the one that occurred in this case were taxable events.

■ We agree with the district court that the transfer in this case must be considered a transfer for consideration and a taxable event. The application of the rules included in this analysis is dispositive of Allied–Signal's claim that the district court erred in sustaining the finding of the Board that the exchange of assets for stock constituted a "sale" within the meaning of § 39–6–402(a)(iii), W.S.1977 (May 1985 Repl.).

■ The only matter requiring further resolution is the one involved in the issue posed by Allied–Signal in which it contends that the intrinsic value of the consideration recognized by the district court should not be greater than zero. We must address the actual value of the consideration furnished for the assets for purposes of computing the taxes that are due. In analyzing the methods to be used for determining the actual value of the consideration in exchange so as to verify the amount of taxes due, we first note the appropriate statutes. Section 39–6–404, W.S.1977 (May 1985 Repl.), provided in pertinent part:

"(a) Except as provided by W.S. 39–6–405, there is levied and shall be paid by the purchaser on all sales of twenty-five cents ($.25) or more an excise tax of three percent (3%) upon:

"(i) The sales price of every retail sale of tangible personal property within the state; * * *."

"Sales price," pursuant to § 39–6–402(a)(iv), W.S.1977 (May 1985 Repl.), is defined as:

"(iv) 'Sales price' means the consideration paid by the purchaser of tangible personal property excluding the actual trade-in value allowed on tangible personal property exchanged at the time of transaction, admissions or services which are subject to taxation as provided by this article and excluding any taxes imposed by the federal government or this article; * * *." (Emphasis added.)

The first step in making the tax assessment based upon a sale of tangible personal property is to define which party to an exchange is the purchaser and which party is the seller. Only the value of consideration provided by the purchaser is used in the computations. Section 39–6–402(a)(iv), W.S.1977 (May 1985 Repl.). The value of the assets that are purchased is not specified as the relevant factor. In this instance, Allied had valuable commodities to transfer, and One Newco paid nothing in exchange but previously unissued stock in a business that had no substantial assets.

We identify One Newco as the purchaser in the context of the statutory scheme and Allied as the seller. One Newco, which we perceived as having been created only for the purpose of acquiring Allied's Wyoming soda ash facilities, purchased those assets plus assets of certain other chemical companies and paid for them with its first issue of stock. The price paid in the exchange, for purposes of the sales tax, had to be the fair market value of One Newco stock prior to the transfer. Allied–Signal has contended that the stock of One Newco had no inherent value since the new corporation had not acquired any assets or conducted any business, and it argues that the value of the consideration paid for the assets must be zero. The flaw in this analysis by Allied–Signal is that the stock of the new corporation possesses some value, at least the value of the expenses of incorporation, whatever that might be.

It follows that the value of the One Newco stock was not zero. The Board, to resolve this dilemma, computed the value of the stock that was exchanged as being the same as the value of the assets contributed by Allied for tax assessment purposes. It now argues that the taxes are to be computed only on the price paid by the purchaser, § 39–6–402(a)(iv), W.S.1977 (May 1985 Repl.), and, in the absence of evidence to the contrary, that price must be equivalent to the value received. That argument is equally flawed because there is no rule that contracting partners must be presumed to have traded property of equal value. Since One Newco had no physical assets at the time of the transfer and its stock had only the value intrinsic to its incorporation expenses, we recognize that the value of its stock at the time of the exchange was equivalent only to those expenses.

In this instance, the difficulty with the assessment is that the record is silent as to what the incorporation expenses actually were. We cannot speculate with respect to that amount and, on the record, we determine that the fair market value of One Newco stock for purposes of computing the applicable sales tax in this instance was either zero or nominal, even though we understand that the stock had some inherent value. *Reiman Const. Co. v. Jerry Hiller Co.*, 709 P.2d 1271 (Wyo.1985); *Krist v. Aetna Cas. & Sur.*, 667 P.2d 665 (Wyo.1983); *Chrysler Corp. v. Todorovich*, 580 P.2d 1123 (Wyo.1978). Because, on the record in this case, the value of the consideration paid by One Newco is essentially zero, we find no statutory justification for assessing taxes in the amount determined by the Department, which is the assessment then affirmed by the Board and the district court. The approach we take is somewhat different from the one argued by Allied–Signal, but the result is the same. No tax is due.

While the foregoing holding resolves this case, we deem it important to consider Allied–Signal's contention that the statute under which the tax was assessed is ambiguous when incorporation transfers are involved and stock is the consideration for the purchase because the Department failed to enforce it in that way for the first forty-five years of its existence and then chose to so enforce it only for approximately the last five years. Allied–Signal relies upon *Tenneco* and argues that such a diametrical interpretation by the Board demonstrates that the statute is ambiguous and must be construed by the courts as a matter of law. As we have noted, this argument is presented in an effort to refute the clear and unambiguous language that we perceived in the statute.

In *Tenneco*, the court had before it a statute that provided:

"The following property is exempt from ad valorem taxation pursuant to the provisions of this act and includes facilities, installations, machinery or equipment attached or unattached to real property and *designed, installed and utilized primarily* for the elimination, control or prevention of air, water or land pollution, * * *." Section 35–11–1103, W.S.1977. (Emphasis added.)

Tenneco Oil Co. was engaged in the construction and operation of a trona mine and soda ash plant during 1980 through 1982. Various pollution control devices, that were required by law, had been installed as the

plant proceeded toward completion. Most of these items had been acquired sometime prior to the time they were to be put in operation as a part of the functioning plant.

For some fifteen years, the Board had interpreted the tax statutes as exempting such devices from *ad valorem* taxes but, in 1982, the Department advised Tenneco Oil Co. that its newly installed pollution control devices could not be exempt that year because of a change in the interpretation of the applicable statute. The Department took the position that the word "utilize," as it was employed in the statute, must be interpreted according to its ordinary meaning, which is "to make use of: turn to practical use or account," *Webster's New Collegiate Dictionary* 1289 (1979), and that pollution control devices were subject to taxation until the plant became operational. The Department's logic was that the devices could not actually have been utilized prior to that time. On review, the Board accepted that argument and upheld the assessment by the Department, but the district court reversed that ruling. This court affirmed the district court on the ground that a change in administrative interpretation of the statute manifests an ambiguity justifying statutory construction, and that the correct construction, based entirely on extrinsic evidence of legislative intent, demonstrated that the pollution control devices were not subject to the disputed taxes.

It perhaps is important to recognize that the statutory language before the court in *Tenneco* could be subject to different interpretations. This court deferred to legislative intent and acknowledged the preeminence of plain language over any rules of statutory construction. In effect, the rationale that differing interpretations made by the same agency demonstrate an ambiguity was made in the context of words that were susceptible to more than one meaning. *Tenneco* was not a case, as argued by Allied–Signal, in which clear and unambiguous language not susceptible to varying meanings was found to be ambiguous because of inconsistent applications by the administrative agency. *See Tenneco*, 694 P.2d 97. *See also McArtor*, 699 P.2d 288, and *Basin*, 578 P.2d 557. The theory urged by Allied–Signal was afforded significant credibility in *Tenneco* because the court acknowledged that administrative statutory interpretations, particularly when combined with legislative silence as to those interpretations, should be afforded deferential treatment. *Tenneco*. *See Stratman v. Admiral Beverage Corp.*, 760 P.2d 974 (Wyo.1988). The logic was appropriate under the unique circumstances found in *Tenneco*, but we would not encourage its use generally. *Tenneco*, whatever its perceived similarities may be, does not control to the point of establishing a mechanism to override clear statutory language. Its teachings go no further than identifying and describing a tool that a court may use to resolve an ambiguity once one has been found to be present. That evidentiary tool, in and of itself, should not establish the ambiguity, and we do not understand that the holding in *Tenneco* is any different.

Our rationale for this observation is found essentially in the realization that inconsistent statutory interpretations often are the product of circumstances that do not really involve an ambiguity. An inconsistent interpretation could be the product of simple error, a change in circumstances, a change in philosophy by the decision makers, or even a change in their identity. Because of the varying possibilities that may lead to inconsistent statutory applications, we do not choose to establish a precedent in which those differing interpretations establish an ambiguity that will justify invoking rules of construction based on extrinsic considerations. Furthermore, we recognize a subtle invasion of the separation of powers doctrine if *Tenneco* is applied as Allied–Signal proposes because it is clear that it is the role of the courts to determine ambiguity in a statute. If ambiguity must be recognized because of inconsistent interpretations by the executive branch, then the executive branch, and not the judicial branch, is establishing the ambiguity. That would not comport with Article 2, Section 1 of the Constitution of the State of Wyoming.

In addition, unnecessary construction premised upon extrinsic evidence refuting clear statutory language would constitute an invasion of the legislative powers also described in our constitution. The legislature is entitled to the presumption that its words will be understood and obeyed, and the language incorporated in the statute is the method employed to convey its mandates. A rule that would infringe upon that concept, such as the rule of acquiescence invoked here, is inappropriate, and the method of construction is to be resorted to only when the words of the statute are sufficiently unclear or ambiguous as to obscure the legislative intent.

In summary, we agree with the district court that the relevant statute should be applied exactly as it is written. There was a taxable sale. In so holding, we also agree that sales taxes were appropriately assessed on transactions such as that occurring in this case as of the time of the transaction. This rule fits with our general presumption favoring tax statutes and strictly limiting exemptions. *State Board of Equalization v. Wyoming Automobile Dealers Association*, 395 P.2d 741 (Wyo. 1964). The assessment of the tax, however, is tied to the consideration that is paid, and it is inappropriate to value that consideration by reference to the value of the property sold. In this instance, the record does not afford any basis for establishing any value for the stock used to purchase the assets other than a nominal one, and the record does not establish what that nominal value was. Consequently, while there was a taxable sale, no tax is due because the record fails to establish the amount paid for the assets acquired.

The analysis and resolution of the issues set forth above make it inappropriate and unnecessary to consider Allied–Signal's concerns with respect to alleged violations of the Wyoming Administrative Procedure Act and the state and federal constitutions.

The judgment of the district court and the decision of the State Board of Equalization are reversed.

URBIGKIT, C.J., files a specially concurring opinion.

URBIGKIT, Chief Justice, specially concurring.

I specially concur. Although well aware of the current national dialogue on the subject of statutory construction, including specifically one approach characterized to be a literalistic implementation, I do not agree with a closed-end and cramped adaptation just like I do not agree that because jurists may differ in the interpretation of a contract, such disagreement necessarily makes the contract ambiguous. We may be the ambiguity.

I have no problem with the application of "legislative intent," whatever it may be, but the difficulty is introduced by attempted segmentation of an amorphous intent which had been created as the composite result of a multiplexed, many faceted process. Intent is normally a question of fact. *First Nat. Bank v. Swan*, 3 Wyo. 356, 23 P. 743 (1890). This court in *Spriggs v. Cheyenne Newspapers*, 63 Wyo. 416, 449, 182 P.2d 801, 814 (1947) (quoting *Edie v. Coleman*, 235 Mo.App. 1289, 141 S.W.2d 238 (1940)) said:

" 'The intent of a person cannot be proven by direct and positive evidence. It is a question of fact, to be proven, like any other fact, by acts, conduct, and circumstances'. *People v. Johnson*, 131 Cal. 511, 514, 63 P. 842, 843."

*See Williams v. State*, 807 P.2d 271 (Okla. Cr.1991). Justice White in *McCormick v. United States*, —— U.S. ——, ——, 111 S.Ct. 1807, 1815, 114 L.Ed.2d 307 (1991) (citing *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991)) stated the rule with simplicity: "It goes without saying that matters of intent are for the jury to consider." Construction of statutes is, however, a determination to be made by the court as a question of law, *McGuire v. McGuire*, 608 P.2d 1278 (Wyo. 1980), since the construction or interpretation defines what the law actually is. *Shepperd v. Boettcher & Co., Inc.*, 756 P.2d 182 (Wyo.1988); *Dowdell v. Bell*, 477 P.2d 170 (Wyo.1970); 73 Am.Jur.2d *Statutes* §§ 143 and 145 (1974).

I specially concur because of an unwillingness to join in the preclusive and overstated language that addresses rules of statutory construction following analysis that this court's approach becomes both overreaching and insufficient. For example, Wyo. Const. art. 1, § 10 guarantees that the accused shall have the right "to be confronted with the witnesses against him * * *." Yet in *Jandro v. State*, 781 P.2d 512, 523 (Wyo.1989), we fashioned an exception to the literal meaning of that amendment when we adopted the construction furnished by *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987). In *Bourjaily*, it was said that "[w]hile a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable * * *," *id.*, the literal meaning would be rejected as too extreme. *See likewise Dowdell*, 477 P.2d 170, where this court added an unstated "intentionally" as a statutory criterion. I cannot find that our constitutional and statutory construction concepts apprehend a system as absolute as is now suggested by the majority in this rather clear decision without need for conceptualization of this literalistic language overlay.

Certainly, the literal meaning of constitutional provisions or statutory language should be given effect when we search for intent when in fact probably no one intent ever existed at the time of of enactment. *Texas Co. v. Siefried*, 60 Wyo. 142, 147 P.2d 837, *reh'g denied* 60 Wyo. 142, 150 P.2d 99 (1944). Additionally, there are times in which the literal meaning of a text is rejected or superseded because the result is undesirable and a clear violation of the probable purpose would otherwise be achieved. *Deherrera v. Herrera*, 565 P.2d 479 (Wyo.1977); *Hecht v. Carey*, 13 Wyo. 154, 78 P. 705 (1904). Any concept that indicates our rules of construction do not

afford flexibility is, in my conclusion, highly inaccurate. *State ex rel. Benham v. Cheever*, 71 Wyo. 303, 257 P.2d 337 (1953). *Cf. McArtor v. State*, 699 P.2d 288 (Wyo. 1985), where this court used the very widest brush to paint the defendant into a valid criminal charge by abject statutory construction.

Among the multitude of texts, there are variant explanations and alternative approaches. Perhaps from a programmatic analysis, several are easily defined.

1. Legislators do not know how to define their desired intent with complete certainty with the language furnished to them by the drafting service.

2. Statutes do not exist like electrons and neutrons motionless at absolute zero in a glass bottle. There are other statutes, historical events and accidents of enactment that relate to the linguistically created and individually cultivated "legislative intent."

3. Separate jurists do not derive exactly the same "communication" from the identical statutory provision. Any listener or reader in the communicative process "understands" only within the concept of the combination of understanding and beliefs into which the communication is embedded.[1]

Competing with the literalistic, common sense, and observed purpose is the legislative history interpretive reliance. The wide divergence is definitively illustrated by the almost opposite views of Retired Justice William J. Brennan, Jr., who is a staunch supporter, compared to Justice Antonin Scalia, who is a caustic opponent of the application and utilization of legislative history. A case of note is *Public Citizen v. United States Dept. of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). *See* Comment, *The Role of Legislative His-*

---

1. There are three generic dispositive principles, somewhat sarcastically phrased (and slightly restated), for a legislator's understanding of debate which may promote equal relevance (or irreverence) within the specialty of determining intent from the resulting product:

    a. To understand what you communicate, I do not care what you say—I want to know

why. When I know why, then I learn what. (Your benefit rule.)

    b. I want to know what you intend to do to my constituents. (Detriment rule.)

    c. Disregarding this flood of words, what is in it for my constituents. (Greed rule.)

*tory in Statutory Interpretation: A New Era After the Resignation of Justice William Brennan?*, 56 Mo.L.Rev. 121 (1991). *See also* Comment, *The Value of Nonlegislators' Contributions to Legislative History*, 79 Geo.L.J. 359 (1990).

It is recognized that intent must be presumed or otherwise the legislature has no purpose. "If there is no ascertainable legislative intent, what then is the part played by the legislature in our system of government?" E. Crawford, *Statutory Construction: Interpretation of Laws* § 163 at 255 (1940). That author further recognized:

> After all, in most instances, the real difficulty lies in determining what is the legislative intent rather than in determining whether one exists. Generally, such an intent may be presumed to exist, for it is not a common occurrence to find legislation which is wholly meaningless. More often the statute may appear to have more than one meaning. Such a condition may be due to the inability of the interpreter to grasp the legislative meaning rather than to the lack of a definite meaning on the part of the lawmakers. It is likely that the legislators at the time the statute was passed had a pretty exact idea of what the statute meant. At least, they were in a position to have a clear knowledge of the statute's meaning, which is generally more than can be said with reference to those called upon to interpret the law months or years later, especially where resort to the debates and committee reports is not allowed. Words which later seem ambiguous, at the time the law was enacted most likely were understood to be used in a certain sense. Legislatures are composed of men with various views. One may properly assume that each member sought to promote and to protect his belief, and consequently watched the language employed carefully. Surely, the resulting legislation represents the composite views of all the members of the legislature—or at least, the views of those voting in favor of the statute—particularly where the statute involves a question of great public interest. The language of the statute is, of course, the reservoir of the legislative intent. But the difficulty in ascertaining this intent in many cases with any convincing assurance of its existence, has undoubtedly led to the assertion or belief that it does not exist. But whether a collective legislative intent exists or not, we must recognize or assume its existence as a matter of fact. Such an assumption or existence is necessary in order for a statute to express the legislative will. After all, a statute is more than a group of words, phrases and sentences. It has a meaning. And the meaning must be one intended by the law-makers or the law-makers do not legislate.

*Id.* at 255–56 (footnotes omitted).

We sometimes fail to recognize, in the science of adaptation and application, that it is necessary to distinguish between ascertaining the legislative intent, *Matter of Voss' Adoption*, 550 P.2d 481 (Wyo. 1976), and in applying the statute, *Reliance Ins. Co. v. Chevron U.S.A., Inc.*, 713 P.2d 766 (Wyo.1986). "The former consists in ascertaining the legislative meaning, while the latter is the determination of whether the facts of a given case are within and without the legislative meaning previously ascertained." E. Crawford, *supra*, § 173 at 274.

E. Crawford, *supra*, § 173 at 274 n. 134, quotes the early case of *Breashears v. Norman*, 176 Ark. 26, 2 S.W.2d 53, 54 (1928), which states most appropriately the rationale or composite approach: " 'The intention of the legislature in framing a statute is to be collected from the words used, the subject-matter, the effect and consequences, and the spirit and reason for the law.' "

> Since the ascertainment of the legislative intent or meaning and the application of the statute to the facts are closely connected and often seem inseparable, the separation into two distinct processes may seem artificial. The division into two processes, however, may be justified by the fact that a statute cannot be applied until the legislative intent has been ascertained. That the separation is not

purely artificial is also further indicated when we realize that even an unambiguous statute must also be applied.

E. Crawford, *supra*, § 173 at 275.

Wyoming cases, a number of which are cited in the majority, can be found advancing almost any concept when then immediately directed to the purpose of the court to either achieve the result desired, *McArtor*, 699 P.2d 288, or more nearly fit the assumed purpose into the assumptions of result and intent attributed to the legislature. *Halliburton Co. v. McAdams, Roux and Associates, Inc.*, 773 P.2d 153 (Wyo.1989). Clearly, textual inconsistencies and substance ambiguity are not synonymous terms.[2] *Cf. Halliburton Co.* and *Attletweedt v. State*, 684 P.2d 812 (Wyo.1984), involving inconsistency, with *Sanches v. Sanches*, 626 P.2d 61 (Wyo.1981), involving ambiguity.

One of the most decisive and thoughtful analyses was provided by District Judge Parker in *Kelsey v. Taft*, 72 Wyo. 210, 263 P.2d 135, 137–38 (1953) (emphasis in original):

> We agree that the literal meaning of any wording of law—be it statute or otherwise—is unjustified, and interpretations should be made in accordance with the drafters' intention, particularly in the case of legislation. However, there is a limitation upon this rule, i.e., before a statute may be interpreted according to the spirit or intention of the legislature, the portion of the statute so interpreted must be *free and clear from ambiguity.*

District Judge Tidball, writing for the Wyoming Supreme Court in the early case of *Houghton Bros. v. Yocum*, 40 Wyo. 57, 61, 274 P. 10, 11 (1929), recognized the non-literal practical adaptation concept:

In construing the above sections of the statute, some general rules of construction should be borne in mind. Statutes should, of course, be construed with a view to effecting the legislative intent, and such intent must be ascertained from the statute or statutes. However, a literal construction of the words used will not be sanctioned, when such construction would defeat the evident purpose of the Legislature. * * * And a construction producing unjust or absurd results will not be adopted, unless the terms of the statute preclude any other construction.

For an identical concept of construction to recognize the "obvious purpose for which [the statute is] enacted," see *Mapes v. Foster*, 38 Wyo. 244, 266 P. 109, 116 (1928).

A literalistic or absolutist adaptation of statutory construction simply ignores the multi-faceted, quite different participants in the legislative process including sponsors, staff, leadership and concurrent outside influences.[3] For example, a major intent in much legislation is to get it passed with something akin to the initial direction envisioned at introduction. That challenge is to cross the goal line by litigative enactment. The composite effort of all active participants is what determines passage and that result should be applied in accord with the language used with reason, recognition of historical purpose and anticipation of intended emplacement as a part of the composite societal rules the jurisdiction's statutory laws. Sometimes the statute simply cannot be enforced because it lacks sense and is beyond the power of the judiciary to correctly remedy by any interpretation. *State ex rel. Fawcett v. Board of County Com'rs of Albany County*, 73 Wyo. 69, 273 P.2d 188 (1954).

---

**2.** Webster's Ninth New Collegiate Dictionary 77 (1986) defines "ambiguous" as "doubtful or uncertain esp. from obscurity or indistinctness * * * inexplicable * * * capable of being understood in two or more possible senses or ways." "Inconsistent" is quite differently defined as "not compatible with another fact or claim * * * containing incompatible elements * * * incoherent or illogical in thought or actions * * * not satisfiable by the same set of values for the unknowns." *Id.* at 610.

**3.** This court in *State v. Sodergren*, 686 P.2d 521, 525 n. 6 (Wyo.1984) in quotation from a case note on the earlier case of *Thomas v. State*, 562 P.2d 1287 (Wyo.1977) related:

> " * * * Determining the specific legislative intent behind a particular law is somewhat akin to searching for the Loch Ness monster; submerged, lurking beneath the surface of the statute, the intent might be there—but then again, probably not. * * * " Case Notes, 13 Land & Water L.Rev. 595, 601 (1978).

It is recognized that there is no legislative intent since the composite group cannot speak from one person's undisclosed or indeterminate "purpose." MacCallum, *Legislative Intent*, 75 Yale L.J. 754 (1966).[4] What we really do to apply statutes in case resolution by analysis of the composite purpose with assumption of first search in the words provided is to add the context existent for a conglomeration into the broad standards of society created by required application. In pragmatic distillation, finding "pure intent" from "plain provisions" is antithetical if not oxymoronic. More nearly reaching reason is determination of purpose to establish effect by application of a reasonable result to the provisions which have been enacted in accord with history and causalities. *Stauffer Chemical Co. v. Curry*, 778 P.2d 1083 (Wyo.1989).

In this effort to define a "purpose" rule for statutory construction, it is quickly apparent that there are a multitude of rules each correct to a degree and frequently competing. Professor Karl N. Llewellyn provides a point-counterpoint observation: "If language is plain and unambiguous it must be given effect" (citing among other authorities *Newhall v. Sanger*, 92 U.S. 761, 23 L.Ed. 769 (1875)) and counterpoint, "[n]ot when literal interpretation would lead to absurd or mischievous consequences or thwart manifest purpose" (also citing among other authorities *Clark v. Murray*, 141 Kan. 533, 41 P.2d 1042

(1935)). K. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Constructed*, 3A Sutherland Stat. Const. 203, 208 (4th ed. 1986) (quoting Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to be Construed*, 3 Vand.L.Rev. 395 (1950)). The quoted items are only number twelve of a total of twenty-eight statutory rules of construction with each then compared to the adverse well-recognized countervailing principle.

A typical statement of a plain meaning rule is " 'where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion.' " J. Kernochan, *Statutory Interpretation: An Outline of Method*, 3A Sutherland Stat.Const. 165, 170 (4th ed. 1986) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). "The uncertain possibility of an exception to the plain meaning rule in the event its application leads to 'absurd or wholly impractical results' is also referred to in the American cases." J. Kernochan, *supra*, 3A Sutherland Stat.Const. at 170 (quoting *Caminetti*, 242 U.S. at 490, 37 S.Ct. at 196). *See likewise Stauffer Chemical Co.*, 778 P.2d 1083.[5]

It is further amplified:

> We agree with Stauffer that this statute does not specifically mention a requirement that the limitation of liability be conspicuous. * * * We conclude that the appropriate rule is that a limitation of liability statement, like a disclaimer of an implied warranty, must be conspicuous in order to become a basis for the bargain. * * *
>
> Our rules for statutory construction lead us to this result. One of those rules is that an absurd result, whenever apparent, is to be avoided. * * * We also followed the rule that the legislature is presumed to intend to adopt legislation that is reasonable and logical and does not intend to adopt statutes that are futile. * * * The presumption in statutory construction is that the legislature does not intend to adopt statutes that are futile. * * * We also invoke the concept, as we reiterated it in *Gerstell [v. State of Wyoming, ex rel. Department of Revenue and Taxation]*, 769 P.2d [389] at 394 [ (Wyo.1989) ], that "statutes that

**4.** The history of difficulty with the notion of legislative intent is not of current vintage. *See* Radin, *Statutory Interpretation*, 43 Harv.L.Rev. 863 (1930). *See also* Bruncken, *Interpretation of the Written Law*, 25 Yale L.J. 129 (1915); Kocourek, *An Introduction to the Science of Law* 201 (1930); and T. Sedgwick, *The Interpretation and Construction of Statutory and Constitutional Law* 327–28 (2d ed. 1874), as cited by MacCallum, *supra*, 75 Yale L.J. at 754 n. 1. The countervailing argument is presented likewise in Landis, *A Note on "Statutory Interpretation"*, 43 Harv.L.Rev. 886 (1930). The 1930 writings are the source of what is called the Radin/Landis dispute. Innumerable authors followed, taking variant views, most of which attributed the intent as intended purpose. *See* MacCallum, *supra*, 75 Yale L.J. at 754.

**5.** The full rule stated in *Stauffer Chemical Co.*, 778 P.2d at 1093 is:

A major change of attitude has, however, overtaken the plain meaning rule in the United States. After a long period in which the plain meaning rule coexisted with rules based on legislative intent and the use of legislative history, the United States Supreme Court in 1940 in *United States v. American Trucking Associations* [310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)] used forceful language to repudiate the plain meaning rule as a rule excluding resort to sources of interpretive aid beyond the words of the statute. The Court stated: "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'." [*Id.* at 544, 60 S.Ct. at 1064.] Since that time, the Supreme Court has seemed to mean what it said so forcefully. Although references to plain meaning or literal meaning appear from time to time in the cases, they are not used by the court to support exclusion from judicial consideration of relevant statutory or non-statutory materials bearing on the intent or purpose of the measure in question. And in 1974 in *Cass v. United States*, [417 U.S. 72, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974)] the Supreme Court, when urged anew by a litigant to apply the old exclusionary plain meaning rule, reaffirmed in express terms the language of the *American Trucking* case quoted earlier. But notwithstanding all this, the rule dies hard, if it dies at all. * * *

There are many reasons why the literal or plain meaning approach should be abandoned, along with the golden rule that builds on it. Not least is the fact that the literal rule runs counter to the findings of students of the symbolic aspects of language. Pitched as it is in terms of *the* plain meaning of statutory words, it assumes that words may have a single necessary meaning independent of

their full context, without regard to how those words were used. This is dangerous and unwise. At root, the literal approach puts the wrong question. The question in human interchanges is not what the words mean but what the user of the words meant by them. Given the inexactness and imperfection of words as symbols in a world of endlessly varied and shifting facts, to put the right question is crucial. Words are means not ends. They are vehicles for the transfer of thought from one human agency to another. A statute, made up of these words, these vehicles, these means, is in significant part a communication from the legislature to the courts and other addresses. If the communication is to work well, the task must be in the first instance to ascertain not what the words as words mean abstractly or to the court or as a matter of common usage but what the legislature sought to convey when it employed them. * * *

The need for asking the right question in interpretation is underlined when one reflects on the difficulties a statutory draftsman faces when he must generalize with imperfect words in framing a statutory rule to deal with an uncertain future. * * *

If the literal rule ignores the limits of language and the teachings of semantics and assumes unattainable perfection in drafting, it also conflicts with the fundamental principle of legislative supremacy. Curiously, it is argued by some scholars that deference to the legislature and the avoidance of judicial lawmaking are reasons for adopting the literal rule. It is assumed in some of these cases that the only alternative is the exercise of an unwarranted discretion. But the risk is that the meaning which seems plain or ordinary to the deciding judge is not the one attached to the statute by its enactors.

J. Kernochan, *supra*, 3A Sutherland Stat. Const. at 170–73 (footnotes omitted).

relate to the same subject matter should be harmonized wherever that is possible." * * * The application of these rules makes it evident that the legislature, in this instance, intended an implicit requirement that a limitation of liability be conspicuous, similar to that expressed in § 34–21–233(b), be engrafted upon the provisions of § 34–21–298.

Any individual statute is a single strand within the woven law. *See State v. Sodergren*, 715 P.2d 170 (Wyo.1986) and *State v. Sodergren*, 686 P.2d 521 (Wyo.1984). The use to which it is actually put is dependent upon the surrounding statutes and the societal environment within which it is used. Like all things where change is inevitable, the environment into which the statutory provision in its specific language is applied will, from time to time, change. The responsibility of the judiciary is to assure reasonable workability of the entire law and faithfully distribute the legislators' intended burden upon that strand. Like man, no statute can totally exist in separate isolation.

Additionally, the equipment the judiciary is provided for decision is confined to that communicative power of language, an inexpert science or system as it is,[6] and even more so when it is the product of the push-pull and countervailing factors which are implicit in legislative action ultimately resulting in enactment. Judge Learned Hand, in the well-considered case of *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *cert. granted* 325 U.S. 847, 65 S.Ct. 1415, 89 L.Ed. 1969, *aff'd* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), addressed a literalistic view:

> The defendants have no answer except to say that we are not free to depart from the literal meaning of the words, however transparent may be the resulting stultification of the scheme or plan as a whole.
>
> Courts have not stood helpless in such situations; the decisions are legion in which they have refused to be bound by the letter, when it frustrates the patent purpose of the whole statute. * * * Of course it is true that the words used, even in their literal sense, are the pri-

mary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

In K. Llewellyn, *supra*, 3A Sutherland Stat.Const. at 205–06 (emphasis in original), it is noted:

> If a statute is to make sense, it must be read in the light of some assumed purpose. A statute merely declaring a rule, with no purpose or objective, is nonsense.
>
> If a statute is to be merged into a going system of law, moreover, the court must do the merging, and must in so doing take account of the policy of the statute—or else substitute its own version of such policy. Creative reshaping of the net result is thus inevitable.
>
> But the policy of a statute is of two wholly different kinds—each kind somewhat limited in effect by the statute's choice of measures, and by the statute's choice of fixed language. On the one hand there are the ideas consciously before the draftsmen, the committee, the legislature: a known evil to be cured, a known goal to be attained, a deliberate choice of one line of approach rather than another. Here talk of "intent" is reasonably realistic; committee reports, legislative debate, historical knowledge of contemporary thinking or campaigning which points up the evil or the goal can have significance.

---

6. Chief Justice John Marshall said in *McCulloch v. State of Maryland*, 17 U.S. (4 Wheat) 316, 414–15, 4 L.Ed. 579 (1819):

Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words, which, taken in * * * their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense—in that sense which common usage justifies. * * * This word, then, like others, is used in various senses; and, in its construction, the subject, the context, the intention of the person using them, are all to be taken into view.

But on the other hand—and increasingly as a statute gains in age—its language is called upon to deal with circumstances utterly uncontemplated at the time of its passage. Here the quest is not properly for the sense originally intended by the statute, for the sense sought originally to be *put into it,* but rather for the sense which *can be quarried out of it* in the light of the new situation. Broad purposes can indeed reach far beyond details known or knowable at the time of drafting. A "dangerous weapon" statute of 1840 can include tommy guns, tear gas or atomic bombs. "Vehicle," in a statute of 1840, can properly be read, when sense so suggests, to include an automobile, or a hydroplane that lacks wheels. But for all that, the sound quest does not run primarily in terms of historical intent. It runs in terms of what the words can be made to bear, in making sense in the light of the unforeseen.

Professor Reed Dickerson initiates the inquiry about there being a problem by quoting H. Hart, Jr. and A. Sacks, *The Legal Process* 1201 (tentative edition 1958): " '*The hard truth of the matter is that American Courts have no intelligible, generally accepted, and consistently applied theory of statutory interpretation.*' " R. Dickerson, *The Interpretation and Application of Statutes* 1, 1 (1975) (emphasis in original).

He then recognized:

The inadequacies of terminology also plague such other basic terms as "meaning," "plain meaning," "intent," "purpose," "express," "implied," "strict interpretation," "liberal interpretation," "equitable interpretation," "ambiguity," "vagueness," "generality," "remedial," "penal," "retroactive," and "context." There are others.

\* \* \* \* \* \*

If one of the two basic steps in reading and applying statutes is to solve the relevant problems of meaning, surely a court should pay appropriate deference to the established principles of communication. \* \* \*

The inadequate attention paid to matters of communication is reflected in many ways, most basically in the typical lawyer's imperfect understanding of the respective roles played by express language, on the one hand, and by context, on the other. Although context is now universally recognized as a vital conditioning element in all forms of communication, little has been done to make clear what it consists of and how it operates. R. Dickerson, *supra,* at 2–3.

The diverse natures to which even a term such as "strict interpretation" is actually applied in totally different contexts is illustrated by the list of five rules provided by Dickerson, each of which has come to denote a character of strict construction. Dickerson includes in an appendix a catalogue of forty popular misconceptions, as he said, "all of which have been causing trouble, [and] are nominated for quick oblivion." *Id.* at 288. He includes as examples:

The problems of applying statutes in the context of specific controversies are exclusively those of ascertaining legislative meaning.

\* \* \* \* \* \*

The express meaning of a statute is all important.

\* \* \* \* \* \*

The interpretation of a statute and its application are the same thing. Consequently, the interpretation of a statute is a one-stage, monolithic process.

\* \* \* \* \* \*

Legislative intent is useful in resolving uncertainties of meaning.

and finally,

The legislature's actual intent, however ascertained, should never be frustrated by the court.

*Id.* at 288–89.

The California Supreme Court, in the recent case of *Woods v. Young,* 53 Cal.3d 315, 279 Cal.Rptr. 613, 807 P.2d 455, 459 (1991), provided simple rules which are similar to what this majority now does, but certainly without the adamancy and empirical certainty:

In construing statutes, we must determine and effectuate legislative intent. * * * To ascertain intent, we look first to the words of the statutes. * * * "Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844, 157 Cal.Rptr. 676, 598 P.2d 836.) Interpretations that lead to absurd results or render words surplusage are to be avoided. (*Ibid.*)

To what do I then object to in the literalistic application now presented for the first time by this court? First, since legislative intent is a first stage action and an ephemeral concept not defined in certainties, I find no justified premise that it is absolute and controlling. The syllogism follows as a question: What does the court do if it cannot, with a defined certainty, determine what the legislative intent may be? Further: How do you determine legislative intent with this certainty without a comprehensive analysis of the history, purpose, personalities and maneuvering involved in the creation of the product? The next problem presented is the supposition that what the particular jurist considers to be clear and unambiguous language may not have any necessary relation to the intent of the sponsor, co-sponsor or predominate group involved in enactment. To say that any rule is absolute completely destroys the validity of saying that intent is absolute, since intent may be ill-expressed or ill-determined. As a syllogism, the conclusion simply does not follow that these inhibitions upon statutory construction assure that the legislative efforts as a determination that the intent of elected representatives will be made effective without judicial adjustment or gloss. What we have in the absolutist application of statutory interpretation and application is a considerably greater result-oriented, judicially-defined legislative process than would ever be the case if a reasonable standard using all factors had been equally applied. I believe that literalists or originalists are essentially result-oriented adjudicators by characterizations to be provided excuse for predetermination.

I suggest we step back and seek satisfaction in the generalists' principles of reason and realism addressed by this court in *Kelsey*, 263 P.2d 135 and *Houghton Bros.*, 274 P. 10. The act I from language context and history is as it may be the apparent intent to be developed as the effectuation of the purpose for which the enactment occurred. With purpose in mind, construction for any particular case as act II should be pursued with recognition that a rule of reason should be applied since intent in the explicit attribution to the multi-participants in result can never be actually determined with certainty in regard to all events of humanity where post-enactment utilization may be challenged in enforcement.

This case illustrates statutory construction by characterization. The basic business transaction presented here was a tax-free exchange or corporate reorganization normally tailored by the careful business planner to minimize or exclude tax obligations under the purview of the Internal Revenue Code by operation of 26 U.S.C.S. § 351 (1990). The history provided by this record is that in the earlier stages of the Wyoming law application, the § 351 type transaction was also considered to be tax free by administrative interpretation of the original Wyoming statute.

In 1985, regulations of the Wyoming State Tax Commission were changed in order that personal property transfers included within these kinds of § 351 exchanges could be taxed as a sale under Wyoming law. No statutory change is presented to authenticate the "modernized" tax department approach, since the 1985 department construction addressed what was considered to be an "ambiguous" statute. The broad sweep of the problem in business organization and reorganization, not including the $2,838,767 tax bite created here, prompted early legislative attention. Wyo. Sess.Laws. ch. 166 (1987) was enacted which, by imposition into W.S. 39–6–402, clearly adopted the federal tax free status for state sales tax liability. *See* W.S. 39–6–402(a)(iii)(B), (E), (F), (K) and (M) and the

comparable provisions of the state use tax, W.S. 39–6–502.[7] This tax claim probably caused that legislative change.

Any anatomical assessment of the pre–1987 statute suggests potential ambiguity existed about taxability of the § 351 exchange and advanced further question about W.S. 39–6–402(a)(iv), which remained unchanged for defining sale price:

> "Sales price" means the consideration paid by the purchaser of tangible personal property excluding the actual trade-in value allowed on tangible personal property exchanged at the time of transaction, admissions or services which are subject to taxation as provided by this article and excluding any taxes imposed by the federal government or this article[.]

The State, in presentation of this case upon facing the refund claim of the reorganized corporate entity after the tax had been initially paid upon billing, first argued that the law was *clear and unambiguous* and must be applied to *create the tax* by interpretation of the legislative intent. The trial court accepted that characterization, applied W.S. 39–6–402(a)(iii) and *confirmed the tax obligation.* The trial court held that for the purpose of the *unambiguous statute,* the transaction was a transfer for consideration of tangible personal property. The trial court further found that the exchange stock had value as measured by what it bought—a very significant trona mining and manufacturing company with all of its equipment and general assets.

As we now search for a characterization of either ambiguous or unambiguous rather than reasonably determined legislative intent and purpose, further contentions of the litigants *before this court* becomes interesting. Appellant taxpayer looked at the refund and argued that the law was *ambiguous* and a further search for legislative intent should be pursued. The company also argued that the stock value was minimal since it was a corporate reorgani-

zation transaction where in effect no real money in a buy/sell transaction actually passed hands. The State continues in response by brief and argument that the statute was *not ambiguous* and that W.S. 39–6–402(a)(iii) covers the transaction for imposition of the tax liability. It is further contended that consideration existed and substantial evidence sustained the agency decision. The taxpayer then summarized the parties' contrasting views in reply brief:

> The principal issue presented by this appeal is whether a 1986 contribution of assets from a parent corporation to its newly-formed, wholly-owned subsidiary, in exchange for the first issue of stock of the subsidiary, constituted a "sale" within the meaning of W.S. 39–6–402(a)(iii). At the time of the subject transaction, W.S. 39–6–402(a)(iii) defined a "sale" simply as a transfer of tangible personal property for a consideration. In its brief, Appellee maintains that this terse definition so clearly and unambiguously encompassed such incorporation transfers that construction of the statute is inappropriate. However, a careful review of this portion of Appellee's brief * * * reveals that the only basis for Appellee's position is its own unsupported, conclusory statements that the statute is unambiguous.

The question of whether an ambiguity exists is to be determined, in this case, with the application of the principles established by this Court in *State Board of Equalization v. Tenneco Oil Co.,* 694 P.2d 97 (Wyo.1985). Appellee asserts that *Tenneco Oil* has no bearing in this appeal because the ambiguity of the statute has not been established * * *. In other words, Appellee states that *Tenneco Oil* becomes applicable only *after* it is determined that an ambiguity exists. This statement overlooks a very significant portion of the *Tenneco Oil* decision,

---

**7.** The bill title states:

AN ACT to amend W.S. 39–6–402(a)(iii) and 39–6–502(a)(ii) relating to the sales and use tax; modifying the definition of "sale" to exclude an exchange or transfer made between certain business entities or in the course of formation or dissolution of certain business entities; and providing for an effective date. Wyo.Sess.Laws. ch. 166 (1987).

for *Tenneco Oil* not only guides us in the proper construction of statutes, it also addresses the threshold question of *when* an ambiguity exists. As discussed in Appellant's initial brief * * *, *Tenneco Oil* clearly establishes, on the basis of Appellee's long-standing, contrary interpretation of W.S. 39–6–402(a)(iii), and the divergent views of the parties, that the statute is ambiguous and that the question of its meaning must be addressed. (Emphasis in original.)

The majority, by characterization in agreement with the State, now determines that the statute *was not ambiguous* even before corrective amendment by the legislature, but then concludes that no consideration was paid by the newly organized One Newco, Inc. in its acquisition of the business in exchange for its newly issued treasury corporate stock.

I agree in special concurrence that the tax should not be assessed. This conclusion comes by application of reasonable rules of interpretation to an *ambiguous statute* as the goal for applying legislative purpose and implied intent. Nothing suggests that the legislature ever expected that the sales tax under the Wyoming statute should be applied to the no-cash-consideration type of business organization and reorganization included within the Internal Revenue Code tax for exchange provisions of § 351.

I could conversely say that corporate stock creates its own "value" by capacity to acquire property of significant value. However, for the purposes of addressing legislative purpose and intent in statutory construction, by application of the language that can provide variant ambiguities in plain word text, I superimpose purpose and reasonable construction.

One of the fundamental principles of statutory construction is to attempt to ascertain the legislative intent and to give its effect. * * * Also, in construing a statute, this court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the statute, rather than a construction defeating the statutory purpose. * * * To further ascertain the intent of the Legislature, the Supreme Court may examine the legislative history and the record of floor explanations or debate of the act in question.

*State v. Burnett,* 227 Neb. 351, 417 N.W.2d 355, 357 (1988).

In analysis of the intrinsic character of the corporate reorganization transaction where no actual money is paid and no real change in finite ownership is created, I specially concur in concluding that the legislature, both before and after 1987, did not statutorily propose a tax on this transactional activity. Plainly, I could have, as did the trial court, find to the contrary. *Saffels v. Bennett,* 630 P.2d 505 (Wyo.1981) (see, however, *Wetering v. Eisele,* 682 P.2d 1055 (Wyo.1984) which "disapproved" the *Saffels* interpretation and *Butler v. Halstead By and Through Colley,* 770 P.2d 698 (Wyo.1989) which superseded both in statutory construction); *Sanches,* 626 P.2d 61. The clarity of the subject or absence thereof is illustrated by an introductory segment in Weisberg, *The Calabresian Judicial Artist: Statutes and the New Legal Process,* 35 Stan.L.Rev. 213, 213–15 (1983) (footnotes omitted) which, although somewhat overblown in rhetoric, combines much of what is logically obvious and currently recited by many commentators on the law:

Nineteenth-century judges often purported to follow very specific and binding rules for reading statutes, but in this century those rules have weakened into quaint and naive homilies, few of which have survived Karl Llewellyn's fiendishly deconstructive achievement of placing them in mutually cancelling pairs. Although modern judges probably spend more time heeding the commands of legislators than the commands of either earlier courts or the constitutional framers, they do not seriously believe themselves bound or even guided by general principles of interpretation beyond the vaguest adages about respect for legislative intent.

Undisturbed by the very sophisticated (and mainly academic) debate over the distinction between the meaning of enacted words and the intent of the enacting legislature, most judges readily claim to be bound by "plain" statutory language. Where there is neither statutory language that is plain nor legislative history that is unambiguous, courts often infer a provision's meaning or intent from the larger purpose of the statute, discovering this purpose by examining the context of the statute as a whole, its legislative history, the scheme of earlier or parallel statutes, or some loose mixture of social and political history.

Although courts rarely express concern that there is nothing very systematic or even coherent about these principles of statutory analysis, hard cases demonstrate how quickly the principles collapse. Even if modern analytic philosophy permits us to speak coherently of the formal meaning of words, it takes only the slightest semantic dexterity to find particular words ambiguous or vague in context. Even if logic permits us to speak sensibly of the intent of a large and diffuse group of legislators, as a practical matter the search for legislative intent is often hopeless.

Professor Weisberg additionally writes:

Even judges who recognize the theoretical possibility of plain meaning concede that it must yield where it produces an absurd result. The uncertain boundaries of absurdity counsel against ever finding language "plain," and the impossibility of a formal definition of absurdity casts doubt on even the logical possibility of any formal plain meaning.

*Id.* at 214 n. 8.

In purposeful conclusion, defining a reasonable construction, *Attletweedt*, 684 P.2d 812, and constituting a "logical inference of the legislative intent," *State v. Stovall*, 648 P.2d 543, 545 (Wyo.1982), I specially concur.