## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT NASHVILLE

### JULY 1999 SESSION

No. M1998-00758-CCA-R3-CD

No. 01C01-9809-CR-00360

FILED

February 25, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | * | |
| **Appellee,** | * | DAVIDSON COUNTY |
| **V.** | * | Hon. Frank Clement, Jr., Judge |
| **DEBORAH LEIGH GOINS,** | * | (Leaving the Scene of an Accident Resulting in Death) |
| **Appellant.** | * | |

For Appellant:
Lee Offman
317 Main Street, Suite 208
Franklin, TN 37064

For Appellee:
Paul G. Summers
Attorney General and Reporter
425 Fifth Avenue North
Nashville, TN 37243-0493

Marvin E. Clements, Jr.
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

T.J. Haycox
Ed Ryan
Assistant District Attorneys General
Washington Square, Suite 500
222 2nd Avenue North
Nashville, TN 37201-1649

OPINION FILED:

AFFIRMED AS MODIFIED

NORMA MCGEE OGLE, JUDGE

## OPINION

The appellant, Deborah Leigh Goins, appeals her conviction by a jury in the Davidson County Probate Court[1] of leaving the scene of an accident without complying with the requirements of Tenn. Code Ann. § 55-10-103(a) (1998) when she knew or should have known that the accident resulted in a death. The trial court imposed a sentence of two years incarceration in the Davidson County Workhouse but suspended the sentence and imposed an equal period of probation. On appeal, the appellant presents the following issues for our consideration:

> 1. Whether the appellant was "involved in an accident" within the meaning of Tenn. Code Ann. § 55-10-101 (1998) and Tenn. Code Ann. § 55-10-103 in the absence of any physical contact between her vehicle and a person or another vehicle.[2]
>
> 2. Whether the trial court erred in instructing the jury that the defenses of duress, necessity, and self defense applied only to the homicide charges contained in the appellant's indictment.
>
> 3. Whether the trial court erred in refusing to permit the appellant to present evidence at trial concerning the victim's "habit" of aggressive driving pursuant to Tenn. R. Evid. 406.
>
> 4. Whether the trial court erred in sentencing the appellant.

Following a thorough review of the record and the parties' briefs, we modify the length of the appellant's sentence to one year incarceration in the Davidson County Workhouse and otherwise affirm the judgment of the trial court.

## I. Factual Background

On November 12, 1997, a Davidson County Grand Jury indicted the appellant, in the alternative, on one count of vehicular homicide, one count of reckless homicide, and one count of criminally negligent homicide. The Grand Jury

---

[1]The Davidson County Probate Court has concurrent jurisdiction with the Davidson County Criminal Court on all matters. An Act to Amend Chapter 124 of the Private Acts of 1963, Ch.279 § 2(1), 1982 Tenn. Priv. Acts 177, 178. See also State v. Coolidge, 915 S.W.2d 820, 825 (Tenn. Crim. App. 1995).

[2]Although the appellant characterizes this issue in her brief as a challenge to the sufficiency of the evidence supporting the jury's verdict, the appellant's argument is essentially one of statutory construction.

2

also indicted the appellant on one count of leaving the scene of an accident resulting in a death. The appellant's case proceeded to trial on May 18, 1998. On May 21, 1998, following the parties' presentation of proof, the jury acquitted the appellant of the homicide charges and returned a verdict of guilt of leaving the scene of an accident resulting in a death.

The appellant's conviction arose from an accident at the intersection of Franklin Pike and Franklin Pike Circle in Davidson County, which resulted in the decapitation and consequent death of Paul Christian Kelly. According to the State's proof, the accident was the culmination of a race between the appellant and Mr. Kelly, occurring over a two or three mile segment of Franklin Pike, between the intersection with Otter Creek and Hogan Roads and the intersection with Franklin Pike Circle. Between these intersections, Franklin Pike is a four lane road, with two lanes proceeding north toward Nashville and two lanes proceeding south toward Brentwood. Witnesses observed the appellant and Mr. Kelly driving in the southbound lanes at speeds approaching one hundred (100) miles per hour while weaving in and out of traffic. According to these witnesses, the appellant and Mr. Kelly appeared to be racing. Indeed, Paula Galui, one of the State's witnesses, recalled that, before the cars moved beyond her field of vision, "neither of [the cars] were slowing down or backing down. [The appellant's] car stayed on . . . the tailend [of Mr. Kelly's car]." Another witness, Marty Sullivan, recalled that the appellant and Mr. Kelly "were going for the gusto." None of the witnesses ever observed the appellant's brake lights or observed the appellant attempt to evade Mr. Kelly or otherwise disengage from the race.

As the appellant and Mr. Kelly neared the intersection with Franklin Pike Circle, they were racing side by side, the appellant's car in the left lane and Mr. Kelly's car in the right lane. Meanwhile, the traffic light controlling the intersection had turned red and both the appellant's and Mr. Kelly's lanes were occupied by other vehicles. However, the two southbound lanes of Franklin Pike widen at this intersection to include a far right lane and a left turning lane, the latter providing

3

access to a Wendy's Restaurant and other businesses. Upon reaching the intersection, both the appellant and Mr. Kelly attempted to move into the far right lane. At this point, Mr. Kelly lost control of his car.

Mr. Kelly's car drove into the embankment on the right side of Franklin Pike and hit a steel pole. As Mr. Kelly was ejected from his car, he was decapitated and a quantity of his blood sprayed against the appellant's car. Several witnesses stopped their vehicles at the intersection or otherwise approached the intersection in order to provide any necessary assistance, but the appellant continued driving south through the intersection.

The appellant drove to a nearby Shell gas station and informed an attendant, Toni Clendenon, that two cars had been racing, and one car had driven into an embankment. She then asked Ms. Clendenon to call 911 and also requested a car wash in order to wash the victim's blood from her car. Upon observing the appellant's car, Ms. Clendenon noted that "[t]here was blood from the front of the car windshield, the top of the car, and over the back." Another attendant, Will Brown, also noticed "spots" of blood on the right side of the appellant's car. According to both attendants, the appellant appeared "panicky" and "scared." The appellant departed the gas station after washing her car.

Jeff Goforth, an officer employed by the Traffic Division of the Nashville Metropolitan Police Department, was dispatched to the location of the accident at the intersection of Franklin Pike and Franklin Pike Circle. According to Officer Goforth, the appellant returned to the scene of the accident approximately forty minutes after the accident. He obtained the following written statement from the appellant:

> [Mr. Kelly's] car went out of control at stoplight intersection of Franklin Road and Franklin Road Court. I just witnessed his car going out of control at stoplight and going over embankment because he was speeding.
>
> I witnessed the car going out of control at stoplight and going over embankment. I immediately went to Shell Gas Station and made sure someone called 911 and told

4

location of accident. Traveling South on Old Hickory Blvd. going straight right lane. Other car going north in left lane. At stoplight other car spinned around - by time I reached stoplight - I was stopped when his car went over embankment and possibly hit pole.

Subsequently, Officer Goforth received a slightly different, oral statement from the appellant, who informed him that Mr. Kelly's car had passed her approximately five tenths of a mile from the intersection of Franklin Pike and Franklin Pike Circle as she was driving south on Franklin Pike toward Brentwood. According to the appellant, when she arrived at the intersection, she observed that Mr. Kelly's car had wrecked. The appellant explained to Officer Goforth that she did not remain at the scene of the accident, because she was upset. Instead, she drove to the Shell gas station and reported the accident before driving home and taking some prescription medication for a migraine headache. Officer Goforth noticed that the appellant's car had been washed, although "there was still some speckled locations of blood on the front right side of the car."

The appellant testified on her own behalf at trial. She testified that she was a partner and shareholder of The Resource Company, Incorporated, an agency that recruits physicians for various healthcare entities throughout the United States. She had worked for this company as a physician recruiter since 1988. Her office was located in Brentwood. On the morning of the accident, the appellant went to work but soon began experiencing a migraine headache. Accordingly, she left work and drove to the Green Hills Medicine Shop to obtain medication that had been prescribed by her doctor. She planned on returning home to take the medication, because her doctor had instructed her to avoid driving when under the influence of the medication. However, en route to her home, she decided to return to work briefly. Accordingly, she turned onto Franklin Pike and drove south toward Brentwood.

The appellant was driving in the right southbound lane as she approached the intersection of Franklin Pike and Otter Creek and Hogan Roads. The traffic light was red, and the appellant slowed her vehicle to a stop. However,

5

she first moved her vehicle into the left lane. She explained:

> [W]hen I have a migraine, I'm very light sensitive, my hearing is sensitive, and I felt like things were in slow motion. I thought I needed to maybe go a little faster myself and get to work and get home so I could take my medication.

When the light turned green, she began to drive through the intersection. She noticed that she was accelerating somewhat slower than the cars in the right lane and suddenly heard a car horn behind her. She looked in her rear-view mirror and observed that the driver of the car behind her, Mr. Kelly, was also flashing his car lights and "waving his arms or his fist or something . . . ." In order to allow Mr. Kelly to pass, the appellant increased her speed, passed several cars in the right lane, and moved into the right lane.

When Mr. Kelly drew abreast of her car, he slowed his car and began shouting and making frightening gestures. The appellant testified that she "started getting afraid . . . ." Mr. Kelly then increased his speed, cut in front of the appellant in the right lane, and applied his brakes, whereupon the appellant moved into the left lane to avoid hitting Mr. Kelly's car. The appellant testified that she attempted on several occasions to allow Mr. Kelly to pass. However, "[t]here was no position on the road, in which I would be, that he [w]ould not be beside me threatening me or gesturing me or scaring me." According to the appellant, Mr. Kelly called her "a bitch and a whore. He shook his fist at me. He gave me the finger. He said something of the nature of, I will get you." On two occasions, Mr. Kelly attempted to force her car into the oncoming lane of traffic. She observed, "[I]t was like, to me, he was using his car as a weapon on me. I felt like he was using it as a power tool and something to just petrify me, and he did."

The appellant further testified that she was unfamiliar with Franklin Pike and that the side streets appeared wooded. She was therefore afraid that, if she stopped on a side street, Mr. Kelly "would injure me or actually kill me; he was that angry." Accordingly, she decided to drive to a more populated section of Franklin Pike. Specifically, she testified:

> I knew that I had to make it down to the Shell station or Wendy's. I knew that I wanted to get somewhere to a place of business where someone could help me. Where if I went in, if he followed me, someone could help me. There was no fleeing from him; there was no escape from him.
>
> I don't remember going real fast; I don't remember looking at my speedometer. I was so scared I wanted to get somewhere where I could get help.

The appellant recounted that, as she and Mr. Kelly entered the intersection of Franklin Pike and Franklin Pike Circle, Mr. Kelly was driving in the left lane, and she was driving four or five car lengths behind him in the right lane. According to the appellant, Mr. Kelly's car swerved to the left before spinning toward the embankment on the right side of Franklin Pike. She observed the car slide into the embankment, heard a crash, and blood splattered on her car.

The appellant testified that she stopped at the traffic light, "laid [her] head down on [the] steering wheel and cried." She recalled that, at this time, she was no longer afraid of Mr. Kelly but was still "traumatized." She recounted:

> I thought I have got to go get help, so I went to the Shell station. I parked my car there and I told them inside that there had been an accident and that there was blood on my car. I knew someone had been hurt because there was blood on my car. I told them that someone needed to call 911 as quickly as possible. So they said they would call, and they did.

The appellant denied ever informing Ms. Clendenon that two cars had been racing. Moreover, the appellant asserted that, when she informed the attendants at the gas station that an accident had occurred, she did not realize that Mr. Kelly had died and, in any event, did not "consider [herself] to be involved with the accident."

The appellant waited outside the gas station for approximately five to seven minutes to ensure that someone called 911 and then washed Mr. Kelly's blood from her car. Afterwards, she drove home in order to take her medication. Her mother was visiting her home at the time of the accident, and, accordingly, the appellant related to her mother her encounter with Mr. Kelly. Her mother quickly drove her back to the accident scene. According to the appellant's testimony, she

7

returned to the intersection of Franklin Pike and Franklin Pike Circle at least thirty minutes after the accident.

At the scene of the accident, the appellant spoke with Officer Goforth and provided a written statement. At trial, the appellant conceded that this statement was inaccurate. Moreover, she admitted that she did not inform police about Mr. Kelly's aggressive behavior. She explained that, when she returned to the accident scene, she was still traumatized by her encounter with Mr. Kelly and the accident. Nevertheless, she was able to deny to police either racing with Mr. Kelly or colliding with Mr. Kelly's car. The appellant similarly testified at trial that at no time during her encounter with Mr. Kelly was she angry with Mr. Kelly or attempting to "get even with him" or race him. She asserted that she was too frightened. The appellant concluded that, although she was saddened "over having been somewhere when the life's blood went out of somebody," she was not responsible for the accident or Mr. Kelly's death.

Laura Shumaker, the appellant's mother, also testified at trial. Ms. Shumaker recounted that, on the day of the accident, she was visiting the appellant for the purpose of attending her granddaughter's wedding. According to Ms. Shumaker, on the morning of the accident,

> I heard my daughter's screaming outside. She was crying uncontrollable. She was very frightened. I couldn't understand what she said; she kept screaming mother. I ran out and she was on the steps crying with her head down and I asked her what happened. It was a few seconds before she could even tell me; she was so upset.

After speaking with her daughter, Ms. Shumaker suggested that they return to the scene of the accident. Accordingly, after the appellant had taken some medication for migraine headaches, Ms. Shumaker drove her daughter to the intersection of Franklin Pike and Franklin Pike Circle. Ms. Shumaker testified that the appellant "was very upset, very emotional, she couldn't hardly talk to the policeman. She was just walking around in a daze."

8

**V.  Statutory Construction of Tenn. Code Ann. § 55-10-101 and Tenn. Code Ann. § 55-10-103**

Preliminarily, the offense of leaving the scene of an accident resulting in a death is governed by Tenn. Code Ann. § 55-10-101, which requires that

> [t]he driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop such vehicle at the scene of such accident or as close thereto as possible, but shall then forthwith return to and in any event shall remain at the scene of the accident until the driver has fulfilled the requirements of Tenn. Code Ann. § 55-10-103.

Id. at (a).  The failure "to stop or comply with the requirements of subsection (a) [is a class E felony] when such person knew or should reasonably have known that death resulted from the accident."  Id. at (b)(2).  Tenn. Code Ann. § 55-10-103(a) provides, in turn, that

> [t]he driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle which is driven or attended by any person shall give such driver's name, address and the registration number of the vehicle such driver is driving, and shall, upon request and if available, exhibit that driver's operator's or chauffeur's license, or driver license, to the person struck or the driver or occupant of or person attending any vehicle collided with, and shall render to any person injured in such accident reasonable assistance . . . .

In her first issue, the appellant asserts that she was not "involved in an accident" within the meaning of Tenn. Code Ann. § 55-10-101 and -103, because there was no physical contact between her car and Mr. Kelly or his vehicle.  In other words, the appellant argues that physical contact between a motorist's car and a person or another car is a prerequisite to criminal liability under Tenn. Code Ann. § 55-10-101.  In support of her argument, the appellant directs this court's attention to the language contained in Tenn. Code Ann. § 55-10-103(a).[3]  As noted above, in addition to requiring the provision of reasonable assistance to anyone injured in the accident, Tenn. Code Ann. § 55-10-103(a) requires any driver involved in an accident to provide identifying information "to *the person struck* or the driver or

---

[3]Actually, the appellant directs the court's attention to our opinion in Trail v. State, 552 S.W.2d 757, 758 (Tenn. Crim. App. 1976), in which we echoed substantially identical language contained in a predecessor statute.

occupant of or person attending *any vehicle collided with . . . .*" (Emphasis added).
According to the appellant, the quoted language connotes physical contact and
should inform our interpretation of the phrase "involved in an accident" for the
purpose of defining the scope of Tenn. Code Ann. § 55-10-101.

This court's primary role in statutory construction is to ascertain and
give effect to legislative intent. Fletcher v. State, 951 S.W.2d 378, 381 (Tenn.
1997). Whenever possible, courts should ascertain legislative intent from the
natural and ordinary meaning of the language used in the statute, "without a forced
or subtle construction that would limit or extend the meaning of the statute." State v.
Pettus, 986 S.W.2d 540, 544 (Tenn. 1999). When, however, "the fair import of the
language of a penal statute, in the context of the legislative history and case law on
the subject, . . . results in ambiguity," the statute should be strictly construed against
the State and in favor of the defendant. State v. Horton, 880 S.W.2d 732, 735
(Tenn. Crim. App. 1994). See generally State v. Rogers, 992 S.W.2d 393, 400
(Tenn. 1999); State v. Levandowski, 955 S.W.2d 603, 604 (Tenn. 1997).[4] In any
event, this rule of strict construction will not be applied if it would lead to absurd
results. Horton, 880 S.W.2d at 735.

The purpose of the statute proscribing leaving the scene of an
accident is to facilitate the investigation of automobile accidents and to assure
immediate aid to those injured in automobile accidents. State v. Correll, No. 03C01-
9809-CC-00318, 1999 WL 812454, at *10 (Tenn. Crim. App. at Knoxville, October 8,
1999). We note that, consistent with this purpose, the plain meaning of the phrase
"involved in an accident" does not necessarily entail physical contact between a
motorist's vehicle and a person or another vehicle. Webster's Third International

---

[4]Citing Tenn. Code Ann. § 39-11-104 (1997), our supreme court recently suggested that this rule of
strict construction may not apply to offenses contained in Title 39 of the Tennessee Code. State v.
Legg, No. M1998-00479-SC-R11CD, 1999 WL 1211487, at *4 (Tenn. at Nashville, December 20,
1999). Compare State v. Horton, 880 S.W.2d 732, 734-735 (Tenn. Crim. App. 1994)(citations
omitted)(while noting the implications of Tenn. Code Ann. § 39-11-104, this court also observed that
the rule of strict construction "'is rooted in fundamental principles of due process which mandate that
no individual be forced to speculate . . . whether his conduct is prohibited'"). In any event, the offense
at issue in this case is defined in Title 55. Of course, Tenn. Code Ann. § 39-11-102 (b) (1997)
provides that parts 1-6 of Chapter 11 of the criminal code "apply to offenses defined by other laws
unless otherwise provided by law." Nevertheless, Tenn. Code Ann. § 39-11-104 is limited by its own
terms to the provisions of Title 39.

10

<u>Dictionary</u> 1191 (1993), provides the following common definitions of "involved": "to [be] draw[n] in as a participant: engage[d] . . . oblige[d] to become associated (as in an unpleasant situation): embroil[ed], entangle[d], implicate[d] . . . relate[d] closely: connect[ed], link[ed] . . . ." Moreover, in the context of the statute at issue, this court has previously approved the following definition of "accident" set forth in <u>Black's Law Dictionary</u>, 15 (6th ed. 1990):

> The word "accident" requiring operator of vehicle to stop immediately in case of accident, contemplates any situation occurring on the highway wherein driver so operates his automobile as to cause injury to the property or person of another using the same highway.[5]

Finally, at least one court has noted that, according to common sense, one need not actually strike another person or vehicle in order to be "involved" in an accident. <u>People v. Mumaugh</u>, 644 P.2d 299, 301 (Colo. 1982)(construing provisions of Colorado's penal code that are substantially identical to the statutory provisions at issue in this case). <u>Cf.</u> <u>People v. Bammes</u>, 71 Cal. Rptr. 415 (1968)(a defendant was "involved" in an accident when she pulled into the path of a station wagon, causing the station wagon to swerve and be struck by a truck); <u>Baker v. Fletcher</u>, 79 N.Y.S. 2d 580 (1948)(a defendant was "involved" in an accident when he opened the door of his car, causing another vehicle to swerve and collide with a third vehicle); <u>State v. Peterson</u>, 522 P. 2d 912 (Or. Ct. App. 1974), <u>reversed in part on other grounds</u>, 526 P.2d 1008 (Or. 1974)(a defendant was "involved in an accident" when the defendant's and the decedent's vehicles were engaged in a drag race, and the decedent's vehicle collided with a third vehicle).

That having been said, we acknowledge that a court "'should not lift one word or clause from a statute and construe it alone without reference to the

---

[5]By referring to this definition, we do not intend to imply that involvement in an accident under Tenn. Code Ann. § 55-10-101 and -103 is necessarily synonymous with legal liability, whether civil or criminal, for the accident. In other words, we reject the appellant's oblique suggestion in his brief that involvement in an accident involving a death under Tenn. Code Ann. § 55-10-101 and -103 entails a proximate relationship between a motorist's operation of her vehicle and the death of another person sufficient to establish the motorist's criminal liability for homicide. <u>See, e.g.</u>, <u>People v. Bammes</u>, 71 Cal. Rptr. 415 (1968)(court observed that the jury's acquittal of the defendant of manslaughter charges was not inconsistent with their finding that the defendant was "involved" in the accident and had an obligation to stop at the scene of the accident; the offense of leaving the scene of an accident "is not concerned with the legal liability for the Cause of the accident but with involvement rather than liability"); <u>State v. Peterson</u>, 526 P.2d 1008 (Or. 1974)(reversing manslaughter conviction but upholding conviction of leaving the scene of an accident when defendant was participant in a drag race during which the other participant drove through a stop sign and was struck by a truck).

11

balance of the statute . . . '" Neff v. Cherokee Insurance Company, 704 S.W.2d 1, 7 (Tenn. 1986)(citation omitted). Nevertheless, as to the ambiguity arguably created by the language contained in Tenn. Code Ann. § 55-10-103(a), we must conclude that the appellant's interpretation of this language would compel an absurd result, directly contrary to the purposes of Tenn. Code Ann. § 55-10-101. According to the appellant's interpretation, even those drivers on the highway who in fact caused accidents resulting in injuries or death but fortuitously avoided physical contact with another vehicle or person could continue blithely on their way without providing identifying information or even assistance to injured persons. We are unwilling, without more, to conclude that the legislature intended this result. Horton, 880 S.W.2d at 735. See also Fletcher, 951 S.W.2d at 382 (in construing statutes, courts should presume that the legislature did not intend an absurd result).[6] In short, we decline to judicially create a requirement of physical contact with a person or another vehicle.

The appellant additionally contends that the legislature did not intend that Tenn. Code Ann. § 55-10-101 and -103 apply to one who honestly believes that she is in danger of bodily harm if she stops at the scene of an accident for the purpose of complying with Tenn. Code Ann. § 55-10-103. However, because the appellant's assertion essentially constitutes an argument for the application of certain defenses set forth in the criminal code, we will address this issue in the context of the trial court's instruction to the jury that the defenses of duress, necessity, and self-defense applied only to the homicide charges contained in the indictment.

---

[6]We note that the Tennessee Financial Responsibility Law of 1977, enacted after the statute at issue, does explicitly exclude from its reporting and security requirements motorists involved in accidents when there was no physical contact with another vehicle or object or person. Tenn. Code Ann. § § 55-12-104(d)(2) and -106(13) (1998). Compare Tenn. Code Ann. § 55-10-107(a) (1998). This distinction is undoubtedly grounded in the narrower purpose of the Financial Responsibility Law.

We also note that Tenn. Code Ann. § 56-7-1201(e) (1998 Supp.) bars any recovery by the victim of a "hit and run" accident under uninsured motorist provisions of an insurance policy unless there was physical contact with the vehicle of the unknown motorist or the existence of the unknown motorist is established by clear and convincing evidence. Again, in attempting to forestall fraudulent insurance claims, this statute serves a somewhat different purpose than the statute at issue in this case.

Furthermore, in light of these statutes, the appellant's interpretation of Tenn. Code Ann. § 55-10-101 and -103 would encourage motorists to leave the scene of an accident precisely when the requisite information would be most needed.

12

## II.     Jury Instructions

The appellant asserts that the trial court erred in instructing the jury that the defenses of duress, necessity, and self-defense were applicable only to the homicide charges.  During the trial, defense counsel orally requested instructions concerning all three defenses.  The trial court granted defense counsel's request but noted that the defenses would only be applicable to the homicide charges, to which observation defense counsel tacitly agreed.  Nevertheless, in the appellant's Amended Motion for New Trial/Judgment of Acquittal, defense counsel challenged the trial court's instructions concerning the defenses of necessity and self-defense. Defense counsel did not address the trial court's instruction concerning the defense of duress.

Pursuant to Tenn. R. Crim. P. 30(b), the failure to object to the content of an instruction given at trial does not bar raising the issue as error in support of a motion for new trial.  State v. Lynn, 924 S.W.2d 892, 898-899 (Tenn. 1996); State v. Graham, No. 02C01-9507-CR-00189, 1999 WL 225853, at *12 (Tenn.Crim.App. at Jackson, April 20, 1999).  Moreover, a trial court has a duty, irrespective of any special request or contemporaneous objection by defense counsel, to instruct the jury concerning issues fundamental to the defense and essential to a fair trial.  State v. Anderson, 985 S.W.2d 9, 17 (Tenn. Crim. App. 1997).  See also State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990); State v. Stoddard, 909 S.W.2d 454, 460 (Tenn. Crim. App. 1994).  Accordingly, the appellant's challenge to the trial court's instructions on necessity and self defense are properly before this court.  However, the appellant's failure to address the trial court's instruction on duress in her motion for new trial results in the waiver of this issue on appeal.  See Tenn. R. App. P.  3(e) and 36(a).

In any event, the appellant's contentions concerning all three instructions have no merit.  First, we agree with the State that the trial court correctly declined to instruct the jury that the defense of self-defense was applicable to the offense of leaving the scene of an accident involving death.  By its own terms, the

13

defense is limited to the threat or use of force against another person by a criminal defendant. Tenn. Code Ann. § 39-11-611 (a) (1997). The appellant's departure from the scene of the accident without providing identifying information or assistance did not involve the threat or use of force against another person.

Second, the defenses of duress and necessity only justify criminal conduct when a defendant thereby attempted to avoid imminent harm and the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct. Tenn. Code Ann. § 39-11-504 (1997); Tenn. Code Ann. § 39-11-609 (1997).[7] In State v. Bult, 989 S.W.2d 730, 733 (Tenn.Crim.App. 1998), perm. to appeal denied, (Tenn. 1999), this court emphasized that

> the defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under these statutory defenses. Thus, the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct.[8]

---

[7]This court has previously noted that "the defenses [of duress and necessity] are similar both in form and in the policy supporting the availability of both defenses." State v. Green, 995 S.W.2d 591, 606 (Tenn. Crim. App. 1998), perm. to appeal denied, (Tenn. 1999). However, this court noted the following distinction between the two defenses, a distinction rooted in the common law:
> Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the *actions of other human beings*, the defense of necessity, or choice of evils, traditionally covered the situation where *physical forces* beyond the actor's control rendered illegal conduct the lesser of two evils.
Id. (emphasis added). Yet, several cases in this state have tended to blur this traditional distinction. See, e.g., State v. Culp, 900 S.W.2d 707 (Tenn. Crim. App. 1994)(discussing defense of necessity in the context of a prisoner's assertion that he escaped from jail, because he was threatened with injury or death at the hands of law enforcement officers and other inmates); State v. Green, 915 S.W.2d 827 (Tenn. Crim. App. 1995)(discussing defense of necessity in the context of an alleged accomplice who claimed that he participated in an aggravated burglary due to a threat by the defendant to harm his son); State v. Terry, No. 02C01-9708-CR-00313, 1998 WL 775651 (Tenn. Crim. App. at Jackson, November 6, 1998), perm. to appeal denied, (Tenn. 1999)(discussing defense of necessity in context of defendant's claim that he drove recklessly, because his passenger threatened him with a gun). See also, e.g., Knight v. State, 601 So.2d 403 (Miss. 1992)(instruction on defense of necessity warranted when a black motorist struck a white child and then fled the scene of the accident in response to an angry crowd and the observation of one onlooker that he had better "get away from here"); State v. Wilhelm, 637 P.2d 1294 (Or. Ct. App. 1981)(a complete instruction on the defense of necessity would be warranted when evidence adduced at trial suggests that a defendant failed to stop at the scene of an accident, because the driver of the other car began to beat on her car with an artificial limb); Huber v. City of Casper, 727 P.2d 1002 (Wyo. 1986)(defense of necessity available to motorist who failed to immediately report an accident when he was threatened by a motorcycle gang). In any event, as noted above, the evidence adduced at trial supported the application of neither the defense of necessity nor the defense of duress.

[8]While this court was addressing, in part, the defense of necessity, this statement is equally applicable to the defense of duress.

14

We again agree with the State that the record is devoid of evidence concerning any threat of imminent harm to the appellant after Mr. Kelly's vehicle drove into the embankment at the intersection of Franklin Pike and Franklin Pike Circle. Indeed the appellant herself testified that, although she was "traumatized," she was no longer afraid of Mr. Kelly at that time, and there no longer existed any threat. A trial court need only submit a defense to the jury when the defense is fairly raised by the proof. Bult, 989 S.W.2d at 733. See also Tenn. Code Ann. § 39-11-203(c) and (d) (1997). This issue is without merit.

### III.    Tenn. R. Evid. 406

The appellant next argues that the trial court erred by refusing to allow the appellant to introduce evidence of Mr. Kelly's "habit" of aggressive driving pursuant to Tenn. R. Evid. 406. However, even assuming that the evidence proffered by the appellant established the victim's habit of aggressive driving within the meaning of Tenn. R. Evid. 406, the evidence was irrelevant in this case to the appellant's guilt or innocence of leaving the scene of an accident resulting in a death. Tenn. R. Evid. 401, 402. With respect to this offense, the only issues to which the proffered evidence possibly related were the defenses of duress and necessity. Yet, as already noted, the appellant conceded at trial that, after Mr. Kelly drove into the embankment, he no longer posed any danger to the appellant. This issue is without merit.

### IV.    Sentencing

Following the appellant's conviction, the trial court conducted a sentencing hearing on June 15, 1998. At the sentencing hearing, the State relied upon the evidence adduced at trial and the pre-sentence report. The pre-sentence report reflects that the appellant has no history of criminal convictions or criminal behavior. She is a graduate of Troy State University, where she obtained an Associate of Science Degree in General Education. The appellant has a stable history of employment and, at the time of the sentencing hearing, was maintaining

15

her position as a physician recruiter for the Resource Company, Incorporated.

The pre-sentence report additionally reflects that the appellant began receiving psychiatric treatment in 1995 from Richland Creek Psychiatric Associates for stress and depression stemming from a recent divorce and resulting in sleeplessness and fatigue. The appellant also began receiving private disability insurance in 1995 due to her psychological ailments and also gastroenteritis inflammation and migraine headaches.

With respect to the instant offense, the appellant provided the following statement to Cheryl Pullen, the probation officer who prepared the pre-sentence report:

> I was not involved in Mr. Kelly's accident on 9/17/97. I was behind him and witnessed his car go out of control. Before Mr. Kelly's car went out of control, he terrorized me, intimidated me, ran my car into oncoming traffic, made horrible gestures at me, yelled obscenities at me, cut my car off while in traffic - I feared for my life. I did not see his vehicle hit the pole after he lost control of his vehicle. I had a severe migraine headache the whole time I was on Franklin Road. I had no idea as to the extent of Mr. Kelly's injuries when he hit the pole after having lost control of his vehicle. I was afraid to get out of my vehicle for fear he might have a gun and shoot me or harm me in some other way. Due to my physical illness and my emotional status at that time (terrified of Mr. Kelly) - I did what I thought I should do - I had no cellular telephone with which to call for help, so I went to the closest populated area - The Shell Station - told the clerk that there had been an accident, told her the location, and asked that she call 911 immediately. I was crying hysterically, suffering from the migraine headache, and traumatized by Mr. Kelly's having terrorized me and made me fear for my life while driving on Franklin Road, then seeing his car go out of control. I then went home, took my medication, and had my mother drive me back to the scene. I feel I have been unjustly accused and convicted of leaving the scene of a fatal accident. I feel I acted within the parameters of the law - especially for the situation I was in.

The appellant also testified on her own behalf at the sentencing hearing. She clarified that she was no longer receiving disability insurance at the time of the accident, although she continued to experience migraine headaches. Moreover, she substantially reiterated her testimony at trial concerning Mr. Kelly's

16

aggressive behavior and additionally asserted for the first time that she never drove more than sixty or sixty-five miles per hour on the day of the accident. Contrary to her testimony at trial, the appellant indicated that she was still afraid of Mr. Kelly after she observed his car drive into the embankment at the intersection of Franklin Pike and Franklin Pike Circle. Accordingly, she drove to the nearby Shell gas station. For the first time, the appellant conceded that she did request a rag from the gas station attendants for the purpose of wiping Mr. Kelly's blood from her windshield. However, she again denied requesting a car wash at the gas station, asserting that the gas station attendants had lied during her trial. Moreover, she denied any realization at the time of the accident of a need to preserve the blood on her car as possible evidence. Finally, the appellant acknowledged that she was aware of the location of the Brentwood Police Department at the time of the accident and was aware that the police department was a shorter distance from the gas station than her home. Nevertheless, she drove home after washing Mr. Kelly's blood from her car.

In addition to relying upon evidence proffered during trial, the appellant presented the following evidence concerning Mr. Kelly's history of aggressive driving: a certified copy of Mr. Kelly's driver record with the Tennessee Department of Safety reflecting a history of eight accidents involving property damage or personal injury between 1988 and 1997, one conviction of reckless driving in 1993, and one conviction of speeding in 1997; a certified order of the Davidson County Circuit Court imposing civil liability upon Mr. Kelly for compensatory and punitive damages resulting from his assault in 1991 upon another person with his automobile; and a certified copy of Mr. Kelly's judgment of conviction in the Davidson County Probate Court of the 1991 aggravated assault.

Moreover, the appellant presented the testimony of witnesses concerning two instances in the late 1980s and early 1990s when Mr. Kelly engaged in aggressive driving including speeding, tailgating other motorists, flashing his car lights at other motorists, honking his car horn at other motorists, yelling obscenities,

17

making rude gestures, and, on one occasion, swerving his car into another for the purpose of forcing the car off the road. One witness referred to Mr. Kelly as "Saddam Hussein on wheels." Another recalled Mr. Kelly's prescient remark that "the faster you go, the quicker you die."

Following the presentation of proof, the trial court sentenced the appellant as a standard, Range I offender to a maximum sentence of two years incarceration in the Davidson County Workhouse but granted the appellant full probation. In sentencing the appellant to two years incarceration, the trial court applied enhancement factor (16), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great. Tenn. Code Ann. § 40-35-114 (1997). In mitigation, the trial court found that the appellant had no criminal record and that, at the time of the offense, the appellant was suffering from a mental or physical condition that significantly reduced her culpability for the offense. Tenn. Code Ann. § 40-35-113 (8), (13) (1997). Additionally, in evaluating the suitability of a sentencing alternative to incarceration, the trial court noted the circumstances of the offense, including the appellant's attempt to eliminate evidence by washing her car following the accident, and further noted that the appellant's testimony during trial and the sentencing proceedings was not entirely truthful, and the appellant lacked remorse for her conduct.

On appeal, the appellant challenges both the trial court's denial of judicial diversion and the imposition of the maximum sentence within the applicable range. Appellate review of the length, range, or manner of service of a sentence is de novo. Tenn. Code. Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the defendant in his own behalf; and (7) the potential for rehabilitation or treatment.

18

Tenn. Code. Ann. § 40-35-102, -103, -210 (1997).  See also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).  The burden is upon the appellant to demonstrate the impropriety of her sentence.  Tenn. Code. Ann. § 40-35-401, Sentencing Commission Comments.  Moreover, if the record demonstrates that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will apply a presumption of correctness to the trial court's sentencing determinations.  Id. At (d); Ashby, 823 S.W.2d at 169.

The record in this case does not support the application of a presumption of correctness in light of the trial court's failure to explicitly address on the record the appellant's request for judicial diversion, notwithstanding the trial court's consideration of several relevant factors and its effective denial of the request.  See, e.g., State v. Electroplating, Incorporated, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)(setting forth factors relevant to granting or denying judicial diversion and emphasizing the need for the trial court to explain its reasoning when denying a request for judicial diversion).  In any event, the trial court's findings concerning the appellant's lack of candor and her refusal to accept responsibility for the offense alone support a denial of judicial diversion.  See, e.g., id. (denial of judicial diversion warranted not only by circumstances of the offense but also by defendant's failure to accept responsibility for the offense); State v. Anderson, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992)(denial of judicial diversion warranted by appellant's failure to accept responsibility for the offense); State v. Smith, No. 02C01-9805-CR-00128, 1999 WL 487029, at *3 (Tenn. Crim. App. at Jackson, July 12, 1999)(a trial judge's finding of untruthfulness is alone enough to uphold the denial of judicial diversion); State v. Phillips, No. 03C01-9801-CR-00024, 1999 WL 135058, at *2 (Tenn. Crim. App. at Knoxville), perm. to appeal denied, (Tenn. 1999)(untruthfulness will support the denial of judicial diversion).

Turning our attention to the length of the appellant's sentence, however, we must agree with the appellant that the trial court erred in imposing a maximum sentence of two years incarceration for the felony offense of leaving the

19

scene of an accident involving a death. We base our conclusion upon the trial court's application of the enhancement factor set forth in Tenn. Code Ann. § 40-35-114 (16), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great. The record simply does not reflect that the appellant's act of leaving the scene of the accident created any risk of bodily injury to any individual. As required by the felony offense of leaving the scene of an accident, Mr. Kelly was already dead at the time of the appellant's offense and no other individuals were injured in the accident. For similar reasons, we reject the State's assertion in its brief that Tenn. Code Ann. § 40-35-114(10) is applicable to the appellant's offense. Indeed, the appellant, while otherwise failing to comply with Tenn. Code Ann. § 55-10-101 and -103, did ask that the Shell gas station attendants notify appropriate authorities that an accident involving an injury had occurred.

In light of the trial court's application of mitigating factors (8) and (13), Tenn. Code Ann. § 40-35-113, and in light of our observation that the appellant's conduct neither caused nor threatened serious bodily injury, Tenn. Code Ann. § 40-35-113(1), the appellant was entitled to the minimum sentence within the applicable range. Accordingly, we modify the judgment of conviction to reflect a sentence of one year incarceration in the Davidson County Workhouse. Tenn. Code Ann. § 40-35-112(a)(5) (1997); Tenn. Code Ann. § 40-35-210(c). On the basis of the record before this court, we decline to disturb the trial court's imposition of a two year period of probation. See Tenn. Code Ann. § 40-35-303(c) (1997).

### III. Conclusion

For the foregoing reasons, we modify the length of the appellant's sentence to one year incarceration in the Davidson County Workhouse. We otherwise affirm the judgment of the trial court.

_____
Norma McGee Ogle, Judge

CONCUR:

_____
Jerry L. Smith, Judge


_____
Thomas T. Woodall, Judge

21